## Miller *v.* Central Trust & Savings Co. (et al.), Appellant.

*Equity—Findings of fact—Review by appellate court.*

1. Findings of fact by a chancellor have the force and effect of a verdict of a jury, and will not be disturbed on appeal if there is evidence to support them.

2. Such findings are, therefore, conclusive except where they are based upon erroneous inferences or deductions from facts; in which case, being the result of reasoning, the appellate court will correct them.

*Contract—Building contract—Insurance of completion of contract—Trust company—Fraud—Misrepresentations—Equity—Evidence—Parol evidence—Appeals—Function of appellate court.*

3. Where equity sets aside or reforms an instrument on the ground of fraud, accident or mistake, parol evidence is admissible, though it may vary or contradict the terms of the writing.

4. Where fraud is alleged great latitude is allowed in the admission of evidence.

5. On appeal from the decree of a chancellor based on findings of fact, it is not the function of the appellate court, where the evidence is in conflict, to state what that court would have held, if it had acted as chancellor.

6. In such case it was the chancellor's exclusive province to pass on the credibility of the witnesses who were before him.

*Equity—Jurisdiction—Whole matter in controversy.*

7. Where equity has taken jurisdiction, it will dispose of the whole matter in controversy between the parties.

*Contract—Building contract—Inducement to procure financial assistance—"Straw" contractors—Fraud.*

8. While a person engaged in a building operation has a right to substitute a contractor for one who refuses or fails to satisfactorily prosecute his work, this does not mean that he may set forth in a schedule, made to secure financial assistance, a list of contractors who are in fact "straw" contractors, none of whom intend to do the work. Such a schedule is a fraud on the person who, relying upon it, furnishes the financial assistance.

*Contract—Partial execution—Discovery of fraud—Rescission— Waiver of fraud—Affirmance of contract—Ratification—Suit for damages.*

9. As a general rule, in partly executed contracts, where one is induced by fraud to make a contract and subsequently discovers fraud, he may either rescind the contract and sue for damages, or he may elect to affirm the contract and hold the parties liable for fraud and deceit.

10. If, in such case, repudiation of the contract is impracticable, continuance of performance will not constitute a ratification precluding relief, independent of the contract; affirmance of the contract is not a waiver of the fraud.

11. In connection with the matters urged as constituting ratification, the obligations of the parties and the nature of the work must be given due weight, as well as the practicability of immediate rescission.

*Corporations—Trust companies—Representation by employee.*

12. A trust company is liable for representations made by one of its employees, where the president of the company testifies that the employee was authorized to speak for it, and he was the man who determined the general course of the company's business.

*Corporations — Trust companies — Insurance against loss in building operations.*

13. Where a trust company engages in the business of insuring against mechanic's liens and noncompletion in favor of persons advancing money for a building operation, its officers should place about the transaction every precaution the law affords.

14. In such case, where loss has been occasioned by the act of a single officer of the company, its stockholders should not be penal-

ized by disallowing to the company all compensation, if it appears that the damages awarded against the corporation are sufficient deprivation under the circumstances.

Argued January 4, 1926. Appeal, No. 320, Jan. T., 1925, by Central Trust & Savings Co., defendant, from decree of C. P. No. 1, Phila. Co., March T., 1923, No. 681, for plaintiff in suit of Isaac J. Miller *v.* Central Trust & Savings Co., Charles E. Biddle and Charles C. Evans. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART and SCHAFFER, JJ. Affirmed and modified.

Bill for accounting. Before BARTLETT, P. J.
The opinion of the Supreme Court states the facts.
Decree for plaintiff. Defendant, Central Trust & Savings Co., appealed.

*Error assigned* was, inter alia, decree, quoting it.

*Edward Hopkinson, Jr.,* with him *Dickson, Beitler & McCouch,* for appellant.—To create a situation where the trust company becomes surety to each partner that the other partner will put up $26,000, or if he does not the trust company will, is fundamentally opposed to the joint and several undertakings of Biddle and Miller in the building agreement and in their bond and in the schedule they approved: Gianni v. Russell, 281 Pa. 320; Seitz v. Machine Co., 141 U. S. 510; Evans v. Edelstein, 276 Pa. 516; First Nat. Bank v. Sagerson, 283 Pa. 406.

Under the circumstances the trust company would have been completely justified and protected in acting in good faith under the powers of sale contained in the building agreement but having secured the written approval of Miller, Biddle and their bondsman, Beatty, prior to agreeing to make the sale, certainly Miller cannot now be heard to question it: Powel's Est., 163 Pa. 349; P. & R. C. & I. Co. v. Schmidt, 254 Pa. 351; Lee v. Trust Co., 252 Pa. 291.

There must be some actual or threatened exercise of power possessed or supposed to be possessed from which the party acting under the duress has no other means of immediate relief: Lehigh C. & N. Co. v. Brown, 100 Pa. 338; Union Ins. Co. v. Allegheny, 101 Pa. 250; Neely's App., 124 Pa. 406.

A defrauded party may waive the fraud and affirm the contract: Mackinley v. McGregor, 3 Wharton 369; Negley v. Lindsay, 67 Pa. 217; Schenck's App., 94 Pa. 37; Dunn v. Bank, 204 Pa. 53; Wood v. Wood, 263 Pa. 521; Corporation F. & F. Co. v. Stoffregen, 264 Pa. 215; Browning v. Rodman, 268 Pa. 575; Levine v. Bank, 281 Pa. 477, 481.

*Thomas F. Gain* and *Francis Shunk Brown,* with them *Harry M. Miller,* for appellee.—The decree in this case does not require the trust company to pay Biddle's share of the cash deficit.

The decision justifies the chancellor's conclusions respecting the authority of Evans: McNeile v. Cridland, 168 Pa. 16; Wilson v. Sale, 41 Pa. Superior Ct. 566; Cates & Shepard v. Seltzer, 62 Pa. Superior Ct. 348; Thompson v. Barrow, 81 Pa. Superior Ct. 216; Humbert v. Meyers, 279 Pa. 171.

An action for a deceit will lie although misstatements of fact and opinion were both relied upon by the party deceived: Gillespie v. Hunt, 276 Pa. 119; Schnurman v. Hillegas, 276 Pa. 556.

When Miller learned of the fraud after the operation was under way, he was not obliged to repudiate the whole transaction; he could elect to proceed and hold defendant liable as for fraud and deceit: Browning v. Rodman, 268 Pa. 575; Lowenstein v. Bache, 41 Pa. Superior Ct. 552; Heastings v. McGee, 66 Pa. 384; Guffey v. Clever, 146 Pa. 548.

OPINION BY MR. JUSTICE KEPHART, February 8, 1926:
The proceeding in the court below was for an accounting. The chancellor found appellee had been fraudu-

lently induced to enter a building operation whereby he was deprived of the sum of $117,000. From the decree entered for that sum this appeal has been taken.

The adjudication of the chancellor, made from a review of more than a thousand pages of testimony, was complete in every essential necessary to sustain the decree; it reflects the result of careful review and analysis. The findings of fact by a chancellor have the force and effect of a verdict of a jury and will not be disturbed on appeal if there is evidence to support them (Glenn v. Trees, 276 Pa. 165; Himrod v. McFayden, 283 Pa. 103), hence they are conclusive in this court except where the finding is based upon erroneous inferences or deductions from facts; in which case, being the result of reasoning, the appellate court will correct them: McConville v. Ingham, 268 Pa. 507; Woodward v. Carson, 208 Pa. 144; Com. v. T., I. & Tr. Co. v. Seltzer, 227 Pa 410, 416; Altaffer v. Anderson Auto. Co., 77 Pa. Superior Ct. 63, 65.

Appellant assails a number of the findings of the chancellor under this exception, and contends there is no evidence to support them. It becomes necessary to review the entire record and from the mass ascertain if there is sufficient to support the decree. There are forty-nine assignments of error to consider but we will limit our discussion to as narrow a space as possible. The following is the story presented by the record and as found by the court below:

Appellee, Miller, is a building contractor; appellant trust company, defendant below, engages in the business of issuing special insurance and otherwise financing building operations along with other business. Biddle, another defendant, also a builder, is co-contractor with Miller. The third defendant is an employee of the trust company, a title holder of the real estate covered by the building operation. Biddle, who had a twenty-four house operation at 53d Street and Florence Avenue, conceived the plan of building sixty-eight houses at

Bemont and Litchfield Streets. He secured an option on the land, had plans and specifications prepared, and secured a number of contracts purporting to cover the entire operation. The total cost was to be $298,000; of this $234,000 must be procured in money. Biddle had arranged through loans for all but $52,000, but his project was about to fall through, when he met Miller at the trust company offices. This company was to be directly connected with the undertaking, as will later appear. Biddle explained his predicament to Miller, reviewing the facts above narrated, and further told Miller that he had sold his twenty-four house operation in the course of construction to the Mooney Co. at a figure which would net him a profit of $30,000, receiving a certified check of $5,000 on account. The contract and check were in the trust company's hands. This was not sufficient to meet the cash balance necessary. If Miller helped out, the trust company agreed to accept the assignment of the Mooney contract to make up his share of the $52,000. While engaged in conversation, Evans, an officer of the trust company, called them into his office. Evans restated practically all Biddle had said, among other things saying that the trust company would accept the Biddle equity in the twenty-four house operation as Biddle's share of the $52,000 shortage, and showed Miller the Mooney contract of sale with the $5,000 check attached. Biddle's share in the new venture would be $26,000 to come out of the Mooney proceeds if Miller engaged in the contract. Evans also showed Miller a schedule prepared by him containing a list of what Evans said were good, reliable contractors, who had furnished bonds to complete the building operation. The cost of each contract was stated opposite the name of the contractor. Miller was assured by Evans the total cost would not exceed $4,400 per house, that all the work and material had been contracted for, and that the proposed undertaking was a very good one. An opportunity to investigate the entire matter, including

the contractors, the bonds and the operation in general, was requested, but Evans stated everything was all right and there was not sufficient time to make an investigation. The option on the land was about to expire, and unless expedited, the entire matter would be lost. Miller and Evans had known each other for a number of years. In view of their acquaintanceship, the positive assurance given, and relying on the representations, Miller shortly afterwards became a partner with Biddle in building the sixty-eight houses.

A finance agreement was executed between the trust company, Biddle and Miller, and, because of it, the representations of Evans are of great consequence. This contract was well worded, calculated, in part, at least, to safeguard the trust company in financing the proposition, if its foundation was on solid ground. Because of the benefits to be received, it was imperative nothing should be said or done calculated to deceive any of the parties concerned. The written contract, after some preliminaries, required the trust company to insure against the noncompletion of the sixty-eight houses the following: (a) The mortgages through which the builders secured the first moneys. (b) The contractors furnishing labor and material, taking therefor the houses or the mortgages in payment. It also guaranteed payment to other persons who furnished work and material not paid in advance or otherwise protected. That the trust company might be protected in the assurance that the builders would complete their project, in addition to securing the partners' bond in the sum of $236,000, it had the bond of a third person in the sum of $20,000. Miller and Biddle were required to do a great many things, all of which were directed to one end,—the successful completion of the project. All funds received from the sale of the mortgages or from the builders were to be deposited with the trust company, as well as the funds coming from the independent building operation of Biddle (being the twenty-four houses mentioned

above), and an independent operation of Miller (not heretofore spoken of), a seventy-house operation. The buildings were to be completed according to the plans and specifications, and all material from the several contractors was to be delivered to the trust company on the operation, to become its property, as an asset to the building operation, free from the interference of Biddle and Miller. While this was no doubt to protect the property from any claims, it emphasizes the extent of the trust company's control in the interest of its guarantee to the policyholders. Free access was given to the buildings, and if the construction did not proceed in a satisfactory manner, the trust company could take charge of and complete it. All payments were to go through the trust company, approved by the builders, and if they refused, the trust company could sign the vouchers for them. Compensation was paid to the trust company in addition to the interest received. Biddle and Miller then executed their agreement for the construction of the property, Biddle having sole charge of the job. The work began, the trust company placed its own inspector in charge and payments were made on vouchers approved by him and signed by the partners.

Sometime after it had proceeded, Miller discovered the representations of Biddle and Evans were false. The equity in the twenty-four house contract that was to be applied to Biddle's share of the cash deficit was not applied, but had been dissipated and the houses sold to one Largeman, who shortly thereafter took into the purchase Evans and another trust company officer. Some of the contractors named in the schedule, prepared by Evans and exhibited to Miller as being responsible contractors to do the work, were not bona fide contractors but convenience or "straw" men placed there for the purpose of securing credit from the trust company. The schedule did not cover all the work and material necessary to complete the job. Instead of the cost being the maximum figure, $4,400 for each house, it

rose much higher. Miller was constantly called on for money, while Biddle, with his twenty-four house equity gone, was credited but $1,100 of the $26,000 that should have been credited on his account. Finally, the houses were completed, and, instead of bringing $6,000 as stated by Evans and secured by Miller on sales made at the beginning of the operation, were sold for $4,900 each at the insistent demand of and through unlawful means by the trust company, and over Miller's repeated objections. The sale wiped Miller out, leaving him in debt under the contract.

Appellant trust company strongly urges there is no evidence to sustain the finding that Evans or the trust company accepted, either as cash or as an assignment, $26,000 of the $30,000 equity in the twenty-four houses for Biddle's share of the cash deficit. It is claimed it was taken as collateral, subject to depreciation, as any other security; moreover, as the evidence to sustain appellant's contention was not competent, it was not responsible for Biddle's share.

It is not denied that a contract had been made with the Mooney Company for the sale of this equity. It was in the trust company's possession along with the $5,000 check. Having these assets of Biddle, it was not at liberty to permit a cancellation to Miller's prejudice without Miller's consent. Control of this equity is undisputed from the schedule. Considering the Mooney contract with reference to Miller, it was held out as an inducement for him to join the business. It may be regarded either as cash, or as an assignment of an interest worth $30,000; the result reached either way is the same. The trust company was obliged to conserve the property if it did not wish to be responsible in case Biddle was not good for the deficit, and, when disposed of as here, it must account for its then value. Even as collateral, good faith would require reasonable efforts to preserve the asset for the operation. It is not disputed the plans and specifications for the twenty-four houses

were changed, and changed at the expense of that operation. Enclosed porches, different style plumbing, and bathroom floors ready for tiling, were the charges largely responsible for eating up the $30,000 equity and causing it to be a liability instead of an asset. It is stated the "mill list" called for closed porches. It is idle to say plans and specifications may be added to in this fashion. It is urged that there was nothing to show the cost of these various changes. It was not necessary. There was a fixed fact in an equity of $30,000 in this operation, evidenced by contract and check. This, under the evidence and findings, was to go into the operation, according to Evans's statement; $1,100 was so credited, the houses were sold to Largeman and the trust company officers subsequently became interested in them. Whether the depreciation came about by any of these acts or not is immaterial, the outstanding fact, so far as Miller is concerned, is that the operation was to have the benefit of the Biddle equity of $30,000,—or at least $26,000 thereof. That it did not get. We will not dwell on the evidence to sustain the finding nor the supporting evidence in the minutes and schedule; there was sufficient in all to sustain the court's findings.

Nor will we comment further on the sale to Largeman and what followed. We are concerned only with the effect of these acts on Miller, under the statements made to induce him to go in. The building agreement is not inconsistent with our conclusion. While the operation must be finished and paid for, and any surplus disbursed as indicated, this does not conflict with the assertion that Biddle's equity was to be treated as found by the court below. This agreement must be understood in the light of the parol representations made when Miller entered the contract.

Relative to the competency of this evidence, we have no intention to depart from the cases of Gianni v. Russell & Co., Inc., 281 Pa. 320; Second Nat. Bank v. Yeager, 268 Pa. 167; Bank of Hooverville v. Sagerson,

283 Pa. 406. But the gravaman of this case is fraud through misrepresentations, and we said in Gianni v. Russell & Co, supra, that fraud, accident or mistake as the basis of the execution of an instrument may be shown. But where equity sets aside or reforms an instrument on any of these grounds, parol evidence is admissible though it may vary or contradict the terms of the writing: Martin v. Berens, 67 Pa. 459, 463. Where fraud is alleged great latitude is allowed in the admission of evidence: Schnurman v. Hillegas, 276 Pa. 556. The schedule mentions as an assignment the equity in the twenty-four houses being constructed by Biddle. The cost of the several contracts were specifically set forth except in one or two instances. The writing states, "Schedule of all contracts made for the Biddle-Miller operation of sixty-eight two-story houses in the fortieth ward, Philadelphia"; so that we have the fraudulent representations supported in part by the schedule prepared by appellant, the company's minutes and the testimony of appellee's witnesses. This evidence was competent to prove the charges laid in the bill.

Nor do we consider Miller's knowledge of the fraud prior to his signing another agreement to borrow money from the trust company, conclusively condoned the original fraud. If it did, it would amount to a ratification and we will deal with that question later.

Of course, the trust company officials dispute a great many things asserted by appellee. In the discussion of this case it is not our function, where the evidence is in conflict, to state what we would have held had we acted as chancellor. It was his exclusive province to pass on the credibility of the witnesses who were before him. We must in such matters take the case from the viewpoint of the court below; it is only, as we have stated, where there is no evidence to sustain the findings or where the reasoning in law or fact is erroneous that we are at liberty to reverse the findings.

In discussing the question of excess cost, we will not repeat the representations found to have been made by the trust company officers on which this charge is based. The schedule showed the total cost to be $298,400 or about $4,400 for each house. It also gave the names of the contractors, the character of their work, and the sum total of their contract. We agree that the statement that the average cost per house would be $4,400 and could be sold for $6,000 or more was an extraordinary statement; but the evidence sustains the findings. The reference to $200 extra for each house was to be considered in connection with the assertion as to the cost; the court held it did not lessen the probative force of the positive statement. The excess cost was in the neighborhood of $86,-532.36. This excess was computed on a basis of the total of excess costs of the individual contracts on the schedule, not on the basis of the excess of total actual cost over the cost shown by the schedule, which would have reached an even larger total.

Appellant controverts the whole line of evidence on which these findings are based. It would serve no useful purpose for us to go into any detail on these matters of cost. We state generally that, from a careful review and study of the record, the necessary evidence was present, and like the verdict of a jury these findings must stand. The excess charges are itemized in a stipulation filed by counsel in the court below. We will answer all that may be considered in any way doubtful.

The lumber item in the schedule called for $20,672. The trust company did not pay for any of it. This item represents a judgment of $31,915.43, much in excess of the schedule and found by the court below to be a charge against the operation; the finding is not excepted to. In the account stated by the court below this is properly taken care of from the assets found to be in the trust company's hands. The charge included material which should have been furnished under other contracts, as, for illustration, hardwood floors, lath for plasterers and possi-

bly other items. While the charge was not specially set forth in the bill of complaint, it is covered by the general averments. Equity having properly taken jurisdiction, it will dispose of the whole matter in controversy between the parties: Holden v. Bernstein Mfg. Co., 232 Pa. 366; Hurst v. Brenner (No. 1), 239 Pa. 216; State Hospital v. Water Co., 267 Pa. 29. The same may be said of the item for plumbing and supplies which appellant thinks is $7,352.85 higher than it should be; but this excess is accounted for in the extra items furnished by Dash and the American Tin & Terne Company.

As to the much-discussed convenience or "straw" contractors, there can be no doubt builders have a right to substitute a contractor for one who refuses or fails to satisfactorily prosecute his work. This is vastly different from holding out to prospective contractors, as an inducement to contract, a schedule made to secure financial assistance and said to include all contracts for construction and to have been made with responsible contractors therein named, with accompanying bonds. This representation was made without Miller's knowledge of conditions as they actually existed, or means of procuring that knowledge because of the need of haste. To illustrate, Warner was listed on the schedule as contractor for plastering at a cost of $10,700 and to furnish the material and labor for hardwood flooring at a cost of $10,200, with bonds in the total sum of $10,200 for the faithful performance of his contracts. He did none of the work called for, nor did any representative of his do it; though vouchers were drawn in his name, he received none of the money. When the contracts were signed, it was with the understanding that he would not be obliged to do any work and he was merely an "accommodation contractor" (a newly invented term). The trust company knew all about this. The material and labor were subsequently furnished by others procured by Biddle at a cost of $27,502.49. This figure was much in excess of the contract price;

some of the material that should have been furnished under these contracts was charged to other contracts. Miller protested against this method of doing business and insisted the bonds should be pursued, but in no single instance did the trust company make any attempt to recover on these bonds. It attempts to evade this responsibility by saying the bonds were taken out in its name for its protection. That is no answer. They were taken out for the benefit of the particular contracts in question, and, whether in its name or that of the contractors, they in possession and control of the trust company, it was in good faith bound to pursue the surety or afford the contractors the opportunity to do it. The representations made to Miller necessitates this conclusion.

No further comment will be made on the plumbing supplies and labor, nor on the carpentry and cement work. As to lime and sand, while appellant states it does not understand this charge, inasmuch as it was only estimated on the schedule, the charge was built up through items being placed in this account that should have been taken care of under the plastering, cement or other contracts.

Appellant insists that Miller ratified his bargain and by the following acts is estopped from setting up fraudulent representations: approval of vouchers for the payment of the work, the return of deposit money from sales to Evans, signing the agreement to sell forty-seven houses to McDonald, joining in an agreement to borrow an additional sum of money, failure to give notice of his intention to claim for fraudulent conduct, knowledge of the Mooney contract, cancellation and sale, and his general appearance in and about the work aiding in the construction as it progressed. There are circumstances where subsequent acts of a party, after knowledge of a fraud practiced on him, commit him to the original agreement, regardless of the fraud, or, as it is termed, he waives the fraud; but, as a general rule, in partly exe-

cuted contracts, where one is induced by fraud to make a contract and subsequently discovers the fraud, he may either rescind the contract and sue for damages, or he may elect to affirm the contract and hold the parties liable for fraud and deceit. "Where the performance in part has been accomplished before the discovery of the fraud, and repudiation of the contract is impracticable, continuance of performance will not constitute a ratification precluding relief independent of the contract": 13 C. J. sec. 653; Browning v. Rodman, 268 Pa. 575; Guffey v. Clever, 146 Pa. 548; Talcott v. Friend, 179 Fed. 676; U. S. Trust Co. v. Chicago Transfer Co., 188 Fed. 292. Affirmance of the contract is not a waiver of the fraud; nor does it bar the right to recover; it does bar a subsequent rescission. In connection with the matters urged as constituting ratification, the obligations of the parties and the nature of the work must be given due weight, as well as the practicability of immediate rescission. The appellee and his cocontractor Biddle were required by practical considerations to complete the houses. Their bond stood good for it, and, as the chancellor finds, every asset owned by Miller was pledged to that end. Miller was placed in a very serious position. It was not the case of an executory contract where one may escape uninjured, to which appellant's authorities refer; nor was it similar to cases of renewal notes given without any steps taken to assert the fraud committed, but it is rather one of an effort to mitigate the loss. Here the builders had performed many of the essential features of the contract at or about the time of execution; the work of construction was well under way, before appellee discovered the fraud; he was not obliged to quit. He took what he considered the only safe course. He completed his job and instituted this proceeding. Of this he was the sole judge. His refusal to approve the vouchers would have gained him nothing. The trust company could have signed them. The return of the sales deposit is of no significance, and the agreement to

sell to McDonald will be taken up later. His joinder in the subsequent agreement for additional money was not ratification but must be considered in the light of all the facts presented including as well those by which he was brought into the contract. He had no knowledge of the Mooney cancellation until sometime afterwards. It is a matter of note that Miller protested to Evans every time he discovered some one other than the named contractor doing the work. The chancellor refused to find ratification from these acts and we agree with that conclusion.

Turning to the question of Evans's authority to act for the trust company, the president testified he was authorized to speak for the company. He was the man who determined the general course of the company's business and who determined the make-up of the schedule before it was submitted to the committee. This and other evidence was ample to sustain the finding of the trust company's responsibility for Evans's acts: McNeile v. Gridland, 168 Pa. 16; Wilson v. Sale, 41 Pa. Superior Ct. 566; Cates & Shepard v. Seltser, 62 Pa. Superior Ct. 348; Thompson v. Barrow, 81 Pa. Superior Ct. 216; Humbert v. Myers, 279 Pa. 171.

Concerning the sale of forty-seven of the sixty-eight houses to McDonald, little discussion of this subject should be necessary. These properties produced a net rental of from $820 to $1,000 a month after deducting all carrying charges and interest. Miller had a contract to sell some of the houses for approximately $6,000. The president of the trust company by letter notified Miller that unless certain things were done, he would force the sale of the property. Of course, had the trust company owned these mortgages, and were asserting a legal right, it might be that would not be called duress; but the mortgages were owned by others and, when the latter spoke of forcing a sale, in view of Miller's situation and the history of the joint undertaking, oppressive measures were being used in the threatened exercise of

power for which Miller had no immediate relief, and, under these and all other circumstances bearing on it, his acquiescence in the sale must be considered, as under duress (Carhill Pet. Co. v. Ennis-Bayard Co., 81 Pa. Superior Ct. 486), at least as not waiving his rights when the trust company wrongfully insisted on the sale. We need not repeat Miller's situation at the time. The houses were sold for $4,900 apiece; about two months later for $5,352 by the purchaser. It requires little to justify appellee's contention in this matter. The fact that the parties secured estimates of values before sale at a time when properties were quite low, will not absolve appellant from responsibility, in view of all the circumstances. The measure of damages was for the chancellor under the evidence. But inasmuch as appellee had a bona fide proposition to sell, at wholesale, the houses for $5,250 each, the figure fixed for retail sale was too high. Under the evidence, the limit should have been $5,350, what the houses were again sold for within a few weeks.

Because of the nature of the trust company's work, it being different from that of the ordinary fiduciary paying out over $464,567, and owing to the fact that the wrongdoing was the act of a single officer, its stockholders ought not to be penalized by disallowing to the company all compensation, and, as to the corporation itself, the damages awarded against it are sufficient deprivation under the circumstances of this case.

Finally, we agree with the court's conclusion with regard to usury, insurance premiums, and the necessity for notice. We merely add, the trust company's business of engaging in building operations may be profitable but at times it becomes quite dangerous. The officers should place about such transactions every precaution the law affords. It would have been quite an easy matter to guard against representations, which it claims were unfounded, concerning the Biddle equity in twenty-four houses. The placing of convenient contractors or straw men on the schedule in order to induce

credit, is absolutely indefensible. It should not be tolerated. The guaranty of a flat price by which the work may be done, to one who is about to engage in it, as Miller, is ofttimes laid hold of quite unfairly by those disappointed in the final outcome. We do not say it was in this case, as the evidence sustains the contrary conclusion, but the door should be closed on such claims so that no difficulty may arise in the future. It is not our policy to discourage these building operations which assist so materially in providing houses in over-crowded cities. It is easy to forestall fictitious claims, and it is quite as easy to get into difficulty in being too zealous to procure contracts in a field of doubtful competition.

The decree of the court below is affirmed with the exception of the modification of $450 on each house sold to McDonald, with interest if any charged, and the trust company's compensation of $7,140. Costs to be paid by appellant.