Wortex Mills, Inc. *v.* Textile Workers Union of America, Appellant.

4

Argued June 2, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Jerome L. Markovitz,* with him *David E. Feller* and *Arthur J. Goldberg,* for defendants, appellants.

*Maurice M. Green,* with him *Albert K. Plone,* for defendants, appellants.

*Paul Brandeis,* for plaintiff, appellee.

OPINION BY MR. JUSTICE BELL, November 15, 1954:

Plaintiff corporation brought a bill in equity against two unincorporated labor unions and the president, executive vice-president and secretary-treasurer of the national union and the president, two vice-presidents, secretary and manager of the local union, to enjoin mass picketing by defendants, and by persons acting on their behalf, and for further general relief.

The Chancellor made, inter alia, the following findings of fact:

Plaintiff made yarn into finished cloth and was engaged in a *seasonal business*. The employees at its plant or business did not belong to any union. No controversy, labor dispute or strike was in progress. Defendants admit that a few days prior to February 19, 1951 the national union, one of the defendants, called a strike in the entire textile industry throughout the nation. In an effort to induce the employees of the plaintiff to become members of the defendant unions and to force the plaintiff to conduct a closed shop, a picket line was thrown about plaintiff's plant commencing February 19, 1951.

On some days there was a double line of 150 pickets congregated at the 4 foot wide entrance door to plaintiff's building, although later on this was reduced to 25 pickets and subsequently to 10 pickets. Many of the employees were afraid to work as a result of threats and intimidations by the defendants. During the first week of the picketing, the production and output of plaintiff's plant was reduced by 90%, and the second week by 85%. The defendants also interfered with delivery of raw materials to plaintiff which were to be used, in part at least, for the manufacture of cloth for the Army and Navy.

The Chancellor (1) found that the mass picketing which was accompanied by threats and intimidation

was illegal, and (2) issued an injunction, and (3) awarded damages of $66,254.34 against the defendants, composed of $10,166.37 payroll expenses, $41,723.07 losses due to cancellation of contracts, and $14,364.90 losses due to forced sales.*

Several important questions are raised by these appeals: (1) Has a State Court jurisdiction to restrain mass picketing which is employed in an effort to organize or promote a union; (2) if a State Court has jurisdiction, can a Court of Equity award damages; (3) did the Chancellor accurately determine the damages; and (4) were the officers of defendant associations individually liable?

Defendants contend, first, that the Labor Management Relations Act of 1947, 61 Stat. 136, et seq., 29 U.S.C.A. §141, et seq., has given the National Labor Relations Board exclusive jurisdiction over labor disputes and thereby excluded state jurisdiction whenever a labor dispute or unfair labor practice is involved; and, secondly, (a) that the picketing or strike was for a lawful purpose, namely, for the purpose of organizing a union, and (b) that any damages resulting to the employer therefrom is *damnum absque injuria.*

Plaintiff contends on the other hand (1) that a State Court still has jurisdiction to restrain unlawful picketing; (2) that its jurisdiction has not been ousted where damages are sought for tortious acts; and (3) that a union is liable in damages for *illegal* acts, even when those illegal acts are part of an attempt to organize a union, since the right to organize gives only a right to organize and picket peacefully for a lawful purpose, and in a lawful manner.

---

* Counsel at oral argument informed the Court that as a result of this picketing plaintiff was compelled to go out of business, but no damages were claimed for this result.

The first question that arises is: Has a Court of Equity jurisdiction to enjoin *mass* picketing which is employed in an effort to organize a union? The answer is undoubtedly "yes". The Supreme Court of the United States and this Court have repeatedly reiterated that *mass picketing is illegal* and that *State Courts have power to restrain such picketing*: *United Construction Workers v. Laburnum Construction Corp.*, No. 188, October Term, 1953, decided June 7, 1954 (United States Supreme Court); *Allen-Bradley Local v. Wisconsin E. R. Board*, 315 U. S. 740, 749; *Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.*, 312 U. S. 287; *Labor Board v. Fansteel Corp.*, 306 U. S. 240; *Wortex Mills v. Textile Workers U. of A.*, 369 Pa. 359, 85 A. 2d 851; *Westinghouse Electric Corp. v. United Electrical, etc.*, 353 Pa. 446, 46 A. 2d 16; *Carnegie-Illinois Steel Corp. v. U. S. W. of A.*, 353 Pa. 420, 45 A. 2d 857.

In *United Construction Workers et al. v. Laburnum Construction Corp.* (U. S.), supra, the Court said (p. 664) : ". . . 'Nor is this a case of mass picketing, threatening of employees, obstructing streets and highways, or picketing homes. We have held that the state still may exercise "its historic powers over such traditionally local matters as public safety and order and the use of streets and highways." Allen-Bradley Local v. Wisconsin Board, 315 U. S. 740, 749.' 346 U. S., at 488."

In *Wortex Mills v. Textile Workers of U. of A.*, 369 Pa., supra, the Court said (pp. 364, 369) : ". . . It is well to recall that a State or other Sovereign has a paramount right and an inescapable duty to maintain law and order, to protect life, liberty and property and to enact laws and police regulations for the protection and preservation of the safety, health and welfare of the people of the state or community; Carnegie-Illinois

Steel Corp. v. U. S. W. of A., 353 Pa. 420, 426, 45 A. 2d 857; Westinghouse Electric Corp. v. United Electrical Workers, 353 Pa. 446, 460, 46 A. 2d 16.

" 'The power and duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents cannot be doubted': Thornhill v. Alabama, 310 U. S. 88, 105; Carlson v. California, 310 U. S. 106, 113. . . . [p. 369] Picketing, if peaceful, orderly and for a legitimate or lawful purpose, is legal and within the protection of the Constitution. A State Court may enjoin unlawful picketing or picketing which is conducted in an unlawful manner or for an unlawful purpose.

[p. 364] "The authorities clearly and specifically dispose of and refute defendants' contention that a State Court (a) cannot enjoin picketing because Congress has taken exclusive jurisdiction of the labor industrial relations field; . . ."

It is clear, therefore, beyond any doubt that a (State) Court of Equity had jurisdiction to issue and that it properly issued in the present case an injunction to restrain mass picketing and violence.

The Supreme Court of the United States has recently decided, adversely to the union, the question of State jurisdiction where damages are sought for tortious acts: *United Construction Workers, etc. v. Laburnum Construction Corporation,* 347 U. S. 656, supra. In that case the Court said: "The question before us is whether the Labor Management Relations Act, 1947, has given the National Labor Relations Board such exclusive jurisdiction over the subject matter of a common-law tort action for damages as to preclude an appropriate state court from hearing and determining its issues where such conduct constitutes an unfair labor practice under that Act. For the rea-

sons hereafter stated, we hold that it has not.

". . . The proceeding was a common-law tort action for compensatory and punitive damages totaling $500,-000. The notice contained substantially the following allegations: While respondent was performing construction work in Breathitt County, Kentucky, under contracts with Pond Creek Pocahontas Company and others, July 26-August 4, 1949, agents of the respective petitioners came there. They demanded that respondent's employees join the United Construction Workers and that respondent recognize that organization as the sole bargaining agent for respondent's employees on the project. They added that, if respondent and its employees did not comply, respondent would not be allowed to continue its work. Upon respondent's refusal and that of many of its employees to yield to such demands, petitioners' agents threatened and intimidated respondent's officers and employees with violence to such a degree that respondent was compelled to abandon all its projects in that area. The notice further alleged that, as the result of this conduct of petitioners' agents, respondent was deprived of substantial profits it otherwise would have earned on those and other projects. After trial, a jury found petitioners jointly and severally liable to respondent for $175,437.19 as compensatory damages, and $100,000 as punitive damages, making a total of $275,437.19.

Petitioners moved for a new trial claiming numerous errors of law, and for a dismissal on the ground that the Labor Management Relations Act had deprived the court of its jurisdiction over the subject matter. Both motions were overruled . . . [.]

"Petitioners contend that the Act of 1947 has occupied the labor relations field so completely that no regulatory agency other than the National Labor Rela-

tions Board and no court may assert jurisdiction over unfair labor practices as defined by it, unless expressly authorized by Congress to do so. They claim that state courts accordingly are excluded not only from enjoining future unfair labor practices and thus colliding with the Board, as occurred in Garner v. Teamsters Union, 346 U. S. 485, but that state courts are excluded also from entertaining common-law tort actions for the recovery of damages caused by such conduct. The latter exclusion is the issue here. In the *Garner* case, Congress had provided a federal administrative remedy, supplemented by judicial procedure for its enforcement, with which the state injunctive procedure conflicted. Here Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct. *For us to cut off the injured respondent from this right of recovery will deprive it of its property without recourse or compensation. To do so will, in effect, grant petitioners immunity from liability for their tortious conduct. We see no substantial reason for reaching such a result.** The contrary view is consistent with the language of the Act and there is positive support for it in our decisions and in the legislative history of the Act.

"In the *Garner* case, we said: 'The National Labor Management Relations Act, as we have before pointed out, leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will the area in which state action is still permissible. . . .'

. . .

*"If Virginia is denied jurisdiction in this case, it will mean that where the federal preventive adminis-*

---

* Italics throughout, ours.

*trative procedures are impotent or inadequate, the offenders, by coercion of the type found here, may destroy property without liability for the damage done.* If petitioners were unorganized private persons, conducting themselves as petitioners did here, Virginia would have had undoubted jurisdiction of this action against them. The fact that petitioners are labor organizations, with no contractual relationship with respondent or its employees, provides no reasonable basis for a different conclusion."

It is clear, therefore, that a State Court has the right and power to hear and determine cases where damages are claimed for tortious or illegal acts by a union or its members or agents.

The next question that arises is: Has a Court of Equity power to award damages for illegal acts which it has lawfully and properly restrained?

Ordinarily a Court of Equity has no jurisdiction to award damages for tortious or illegal acts, but this is subject to the well recognized principle that once equitable jurisdiction has attached, Equity has jurisdiction to do *complete* justice between the parties and, inter alia, award damages for tort (or for breach of contract), as well as grant other equitable relief: *Philadelphia Gas Works v. Philadelphia,* 331 Pa. 321, 359, 1 A. 2d 156; *Massachusetts Bonding Co. v. Johnston & Harder, Inc.,* 330 Pa. 336, 199 A. 216; *Gray v. P. & R. C. & I. Co.,* 286 Pa. 11, 132 A. 2d 820; *Union of Russian Societies v. Koss,* 348 Pa. 574, 579, 36 A. 2d 433; *Allison & Evans' Appeal,* 77 Pa. 221, 227; *Bowman v. Gum, Inc.,* 327 Pa. 403, 412, 193 A. 271; *Fleming v. Adamson,* 321 Pa. 28, 32, 182 A. 518; *Schwab v. Miller,* 302 Pa. 507, 509, 153 A. 731; *Miller v. Central Trust & Savings Co.,* 285 Pa. 472, 484, 132 A. 579; *Walters v. McElroy,* 151 Pa. 549, 25 A. 125; *State Hospital for Criminal Insane v. Consolidated Water Supply Co.,*

267 Pa. 29, 110 A. 281; *Epstein v. Ratkosky,* 283 Pa. 168, 129 A. 53; *Eble v. Jones,* 158 Pa. Superior Ct. 270, 44 A. 2d 761; 30 C.J.S., Equity, §72, page 425; 1 Pomeroy, Equity Jurisprudence, §231, §237, et seq.

In *Allison & Evans' Appeal,* 77 Pa., supra, a Court of Equity enjoined the lessee of an adjoining parcel of ground from sinking a well which resulted in injuries to plaintiffs' wells, and at the same time assessed damages against defendant for the resulting injury. The Court said (p. 227): "Are they entitled to a decree for the damages found by the master? The court below refused to make such decree, on the ground that the plaintiffs' remedy was in a court of common-law jurisdiction, and not in a court of equity. But it is well settled, as a general principle, that where a court of equity has obtained jurisdiction for one purpose it may retain it generally for relief.

"This seems to be the rule, not only when the jurisdiction attaches for discovery in cases of fraud, accident, mistake and account, but where *it attaches for injunction in cases of continuing trespass* and waste. In such cases the course is to sustain a bill for the purpose of injunction, connecting it with the account, and not compel the plaintiff to go into a court of law for damages; Thomas v. Oakley, 18 Vesey 184. To prevent multiplicity of suits, the court will decree an account of the damages or waste done at the same time with an injunction, and proceed to make a complete decree, so as to settle the entire controversy between the parties."

In *Philadelphia Gas Works v. Philadelphia,* 331 Pa., supra, Mr. Justice LINN, speaking for the Court, said (p. 359): " 'Equity is the special forum for obtaining an injunction, which may be granted *to prevent actual or threatened trespasses* or nuisances of a continuing and permanent character . . . and, when

once the jurisdiction has thus attached, equity will itself proceed to round out the whole circle of controversy, by deciding every other contention connected with the subject-matter of the suit, *including the amount of damages to which plaintiff is entitled because of injuries theretofore sustained.'* Gray v. Phila. & Reading Coal & Iron Co., 286 Pa. 11, 16, 132 A. 820. . . .

"In Tide Water Pipe Co. v. Bell, 280 Pa. 104, it was said: 'Being of opinion that plaintiff's title to the right-of-way has not been lost, we may, in order to round out the whole circle of controversy between the parties (McGowin v. Remington, 12 Pa. 56, 63; Hurst v. Brennen (No. 1), 239 Pa. 216), so decree in this case; even though, but for defendant's wrongdoing, the question of title would have been cognizable only in a court of law (Wilhelm's App., 79 Pa. 120; Pennsylvania Co. v. Ohio River Junction R. R. Co., 204 Pa. 356, 367) ; . . .' "

In *Massachusetts Bonding Co. v. Johnston & Harder, Inc.,* 330 Pa., supra, plaintiff filed a bill in equity for an accounting. Defendant set up a counterclaim for unliquidated damages for the unlawful cancellation of an agency contract by plaintiff and the fraudulent seizure by plaintiff of defendant's business. The Court said (p. 339) : "Equity having assumed jurisdiction over a cause of action will retain it for the purpose of effecting complete justice between the parties, even though there is included in such determination the settlement of unliquidated claims for damages. Equity, in these circumstances, is competent to dispose of the entire controversy to prevent unnecessary litigation: Wally et al. v. Wally et al., 286 Pa. 413, 417; Stone v. New Schiller B. & L. Assn., 310 Pa. 196."

In *Union of Russian Societies v. Koss,* 348 Pa., supra, the Court said (p. 579) : "In an action of account,

a defendant may be decreed a balance found to be due, even though no cross bill was filed (1 C.J. 639; Anthracite Lumber Co. v. Lucas, 249 Pa. 517, 95 A. 80; 10 R.C.L. 484); and, under like circumstances, the decree may settle an account as between the codefendants: (1 C.J. 640). The basis for this conclusion is that where a court of equity has taken jurisdiction of a case, it will proceed to round out the whole circle of controversy, between the parties, *by deciding every contention connected with the subject-matter of the suit*. (Gray v. Philadelphia & Reading Coal & Iron Co. et al., 286 Pa. 11, 132 A. 820; Miller v. Central Trust & Savings Co. et al., 285 Pa. 472, 132 A. 579; Schwab v. Miller et ux., 302 Pa. 507, 509, 153 A. 731; Fleming et al. v. Adamson et al., 321 Pa. 28, 32, 182 A. 518; Bowman v. Gum, Inc., et al., 327 Pa. 403, 412, 193 A. 271.)"

In *Gray v. Phila. & Reading Coal & Iron Co.*, 286 Pa., supra, plaintiff, who owned property abutting on the Schuylkill River, filed a bill in equity for an injunction and for damages against eight coal mining companies whose operations cast culm and other refuse material from their mines into the river, with consequent damage to her land. Although the act of each defendant was separate from all the others, this Court sustained the bill and said (p. 16): ". . .Equity is the special forum for obtaining an injunction, which may be granted *to prevent actual or threatened trespasses* or nuisances of a continuing and permanent character (Kepple v. Lehigh Coal and Navigation Co., 200 Pa. 649; Kramer v. Slattery, 260 Pa. 234); and, when once the jurisdiction has thus attached, equity will itself proceed to round out the whole circle of controversy, by deciding every other contention connected with the subject-matter of the suit, including the amount of damages to which plaintiff is entitled because of

injuries theretofore sustained: Allison and Evans' App., 77 Pa. 221; Walters v. McElroy, 151 Pa. 549; State Hospital for Criminal Insane v. Consolidated Water Supply Co., 267 Pa. 29; Epstein v. Ratkosky, 283 Pa. 168."

It is clear, therefore, that a Court of Equity had power to issue an injunction in this case because of the illegal acts of the defendants and as incidental thereto, to award such further equitable relief as it deemed just and proper, including specifically the right to award damages for injuries and losses sustained as a result of defendants' tortious acts.

That brings us to the next question: Was there adequate evidence of damages to support the Chancellor's award of $66,254.34?

The first item of direct loss is "wages" in the sum of $10,166.37, which were paid by plaintiff to its employees during the four weeks of the illegal picketing. The fact that plaintiff's employees were able to produce only a small amount of finished goods due to defendants' illegal picketing is no justification for depriving these employees of their wages or denying plaintiff's right to recover the same. Obviously, plaintiff could not tell what day or week the illegal picketing would end, nor could it go out and hire, at a moment's notice or within a reasonable time, skilled workmen if its employees refused further employment, as they likely would have, if, through no fault of their own, they were unpaid for a week or more.

The next item of damages allowed by the Chancellor was $41,723.07 representing certain expenses and loss of profits due to defendants' illegal picketing.

The third item totaling $14,364.90, representing losses incurred by having to sell seasonal goods out of season, was likewise allowed.

These will be considered together. From a careful reading of the record we are of the opinion that the Chancellor's findings on these items are based upon adequate evidence. The record showed cancellations for late delivery when plaintiff was prevented from filling orders or contracts because of the illegal acts of defendants and also showed sales of merchandise below cost when the goods subsequently produced by the plaintiff were unseasonal. Plaintiff produced its books and records which showed a tremendous detailed loss of production during the period of illegal picketing from February 19 to March 15, 1951, during which period plaintiff was able to produce only a trickle of finished goods; it likewise showed a minute, detailed breakdown of the expenses and damages incurred and the loss of profits sustained. Defendants produced some evidence to the effect that plaintiff's orders were canceled because of defects or inferior quality. Mr. Fox explained why certain invoices were marked "Seconds", i.e., so that there could be no claim by the purchaser that the goods must have been defective because they were sold considerably below the original contract price. While the evidence was conflicting, the Chancellor who saw and heard the witnesses believed the plaintiff.

The books and records were corroborated and supplemented by the testimony of plaintiff's president, Fox, who was the only active officer, did the buying and selling, and practically ran the corporation singlehanded. He testified, inter alia, to the exact cost of the yarn, to the exact cost per pick, to the exact cost of the finishing, the cost of the overhead and the markup, and (from his experience) to the exact percentages involved in arriving at a selling price and resulting profits. Fox also testified as to the actual figures that production dropped during the period in question and

produced the signed orders and his records to show the amount shipped and *the amount cancelled for each and every order.* The testimony of several of defendants' witnesses corroborated in part the testimony of the plaintiff that these cancellations were made because of late delivery. Fox further testified in detail as to the goods which had to be sold below cost some six months to a year later and the specific loss thereby incurred.

The Chancellor found that the cancellations resulting from defendants' illegal acts totaled $245,-429.75 and the expenses incurred and the loss of profits resulting from said cancellations totaled, as above noted, $41,723.07. The Chancellor based his findings on the testimony of the plaintiff and its books and records, which showed the name of the customer, the quantity of pieces ordered, the exact quantity cancelled, the contract price, the amount cancelled, sales commissions 5%, overhead 7%, and a total loss of profits of 5% of the cancelled goods.

Findings of fact made by a Chancellor who saw and heard the witnesses will not be reversed on appeal if they are supported by adequate evidence and confirmed by the Court en banc: *Peters v. Machikas,* 378 Pa. 52, 105 A. 2d 708; *Pregrad v. Pregrad,* 367 Pa. 177, 80 A. 2d 58; *Barrett v. Heiner,* 367 Pa. 510, 80 A. 2d 729.

The Chancellor's findings of fact were supported by adequate evidence and confirmed by the Court en banc and therefore must be sustained.

The defendant unions are clearly and unquestionably liable for the damages awarded by the Chancellor in this case. However another question arises: Are the officers of defendant associations *individually* liable?

Prior to the Pennsylvania Rules of Civil Procedure, an action could not be maintained at law or equity against an unincorporated association *eo nomine* regardless of the nature of the action. The only remedy was to bring a bill in equity *against some of the officers or members* as representing themselves and all others having the same interest, and after final decree, hope that the individual defendants could compel the association to pay the claim.*

Officers and individual members of a union or other similar unincorporated association are liable for acts which they individually commit or participate in or authorize or assent to or ratify. Cf. *Patterson v. Wyoming, etc.,* 31 Pa. Superior Ct. 112; *Jenne v. Sutton,* 43 N.J.L. 257; *Lawlor v. Loewe,* 235 U. S. 522, 535; *United Mine Workers v. Coronado Coal Company,* 259 U. S. 344; *United Traction Co. v. Droogan,* 189 N.Y.S. 39; *Bloom v. Vauclain,* 329 Pa. 460, 198 A. 78; *Dunlap Printing Company v. Ryan,* 275 Pa. 556, 560, 119 A. 714; *Ash v. Guie,* 97 Pa. 493; *McNeal v. Farmers' Market Company,* 43 Pa. Superior Ct. 420; 7 C.J.S., §20(c), p. 55.

We find that there was no evidence to prove that any of the individual defendants committed or participated in or *expressly* authorized the illegal acts hereinabove recited, nor was the evidence sufficient to

---

* However, under present practice, Pa. R. C. P. 2153 provides that an action may be prosecuted against an association alone. Subparagraph (c) confers on the plaintiff the procedural privilege of joining members of the association as co-defendants. This is not a rule of substantive law, making the members of an association liable for claims upon which the association is liable. Resort must be had to the decided cases which have expounded the applicable principles of substantive law holding members of an unincorporated association individually liable upon claims against the association. Goodrich-Amram Civil Practice, Vol. 2, §2153, page 8.

enable a Chancellor to reasonably and legitimately infer that the *mass* picketing and other illegal acts were authorized or planned or assented to or ratified by the officers of the defendant unions. They are therefore not liable for the damages.

The Decree as thus modified is affirmed; each party to pay its, his and their own costs.

Mr. Justice MUSMANNO dissents.