Neuman v. Schweidel et al.

*Wolf, Block, Schorr & Solis-Cohen,* for plaintiff.

*Emil Francis Goldhaber,* for defendant Schweidel.

*Robert T. McCracken,* for defendant Corn Exchange National Bank & Trust Co.

SLOANE, J., March 25, 1944.—Separate affidavits of defense raising questions of law have been filed by defendants. Plaintiff's statement of claim is for conspiracy to defraud. We say just a word that the action, through simple oversight, came out in assumpsit when it was meant to sound in tort. But this has been cured without objection; in that respect we are way past the year-book days when you had no remedy (and thus no right, nondialectical), where there was no writ to fit. Leaving that to the side, plaintiff did bring the suit and filed a statement of claim, and since to the statement there were filed by both defendants affidavits of defense raising questions of law, we at this stage consider the well-pleaded statements in the claim for facts:[1]

Plaintiff Neuman was a shareholder in the Haller Company, a closely-held Pennsylvania corporation engaged in the business of rectifying, blending, and selling whisky and other alcoholic beverages. He owned 841⅓ shares out of a total of 5,000. There were four other shareholders, among whom was one Stein, who owned

[1] See Commonwealth ex rel. Duff, Attorney General, v. Keenan et al., 347 Pa. 574 (1943), footnote 1, p. 582.

1,241⅓ shares. Another shareholder, Laden, also owned 1,241⅓ shares.

There was a written agreement amongst Stein, Laden, and plaintiff which, so far as pertinence goes, provided:

"The parties to this agreement do hereby pledge themselves, one to the other, that after they are in possession of the respective number of shares of capital stock as herein recited, should either one, at any future time, desire to sell his holdings, he will before effecting such sale, give the refusal to the two remaining parties, at the same price as he may be able to obtain from any other person or persons, and the two remaining parties shall have the right to purchase an equal number of shares so offered. The party to this agreement making the offer to sell shall give to the remaining parties an option for Thirty (30) days from the date of making the offer to sell. If one of the remaining parties does not wish to purchase the amount offered, then his rights are automatically transferred to the other."

A purpose of this provision was to maintain the ownership of the Haller Company shares within the small group which then held it and "to protect themselves against the intrusion of strangers into the corporation".

Stein died on June 5, 1943. Corn Exchange, one of the defendants, qualified as executor of his will, and came into possession of Stein's shares. Stein had been the owner, too, of 1,000 barrels of whisky which he had orally agreed to sell to the Haller Company when it might need and request it. Corn Exchange refused to recognize this oral agreement as binding (plaintiff makes no further point and seeks no avail on this score), but did grant that under the written agreement Neuman and Laden were, in exercise of their option, entitled to buy Stein's shares at the same

price which Corn Exchange might obtain from an outside party.[2]

At the time Corn Exchange became executor of Stein's shares and whisky there was a ceiling price of about $54,000 on the whisky, established by the Office of Price Administration, and it was illegal to buy or sell the whisky in excess of that price. Because of the great demand for and the dwindling supply of whisky the market price would be at least three times the ceiling price if there were no restrictions. The privately-owned Haller Company shares had no market value at all, the book value of the shares held by Corn Exchange was about twenty thousand dollars at the end of 1942, and two recent sales had been at less than $15 per share.

Plaintiff states that Corn Exchange, in pursuance of a plan to evade the ceiling price of the whisky and get more for it than permitted by O. P. A. regulation, determined to tie in the sale of the whisky with the sale of the shares, on which there was no ceiling price, and thus secure offers for both the whisky and the shares which would exceed in good measure the sum of the ceiling price of the whisky and a fair price for the shares. The other defendant, Schweidel, was very anxious to purchase the whisky and was willing to pay far more than the ceiling price. He knew plaintiff and Laden and of the option agreement; he knew there was a strong likelihood of the option being exercised if he should be the high offeror for the shares. This likelihood arose from two causes, the desire of plaintiff to keep the corporation closed and his distaste for Schweidel, who knew he would be considered an undesirable associate by plaintiff. Corn Exchange supposedly knew the probability of the option being exercised because of these reasons.

---

[2] Defendants do not raise any question as to the validity or enforceability of the option agreement. In this connection see annotation in 136 A. L. R. 138.

Plaintiff also states that in pursuance of the conspiracy Schweidel made a combination offer for the whisky and the shares of $99,000. This was broken down into $54,000 for the whisky and $45,000 for the shares. The latter figure was communicated to plaintiff and Laden as an offer from Schweidel for the shares, and in exercise of the option Neuman bought at that price. (Laden was unable to buy and his rights were thereby transferred to plaintiff.) Schweidel became the purchaser of the whisky for $54,000.

Upon discovery of the facts plaintiff brought this suit for $25,000, as the difference between $45,000, the price he paid, and $20,000, a sum which "represented the maximum price paid for the stock alone",[3] and again "the highest price which any purchaser of the stock alone would be willing to pay and which Schweidel was willing to pay on a bona fide trading basis".

Corn Exchange raised the procedural points that it is improperly sued in its individual capacity (instead of as executor) and that there is a misjoinder of parties defendant. Since this is an action for an alleged tort, the suit is properly brought against this defendant in its individual capacity. See Clauson v. Stull, 331 Pa. 101 (1938), and cases therein cited. The joinder with Schweidel is also proper, for in paragraph 18 of the statement it is alleged that Corn Exchange and Schweidel conspired to make it appear that the shares and whisky were being sold separately, and that there was a bona fide offer of $45,000 for the shares alone. Since it is averred that defendants committed a tort against plaintiff in concert with each other, the joinder is proper. The objections were valid when the action was in assumpsit; the amendment to trespass has removed their force.

---

[3] This is obviously inaccurate, for the only person who paid for the shares is plaintiff.

However, the principal contention of defendants is that the statement shows on reading that no fraud or deceit was present as to plaintiff; that as to him there was a bona fide offer of $45,000 for the shares. From the statement it is clear that the combination offer of $99,000 by Schweidel was an actual offer, and that he was prepared to carry it out if plaintiff had not bought the shares for $45,000. Defendants argue that there was not even a violation of O. P. A. regulation because the shares and whisky were ultimately sold to different purchasers, the whisky at ceiling price only. It would seem, however, that there was an attempt at violation in view of the decision in United States v. Armour & Co., 50 Fed. Supp. 347 (1943), where it was said that tying the sale of a commodity with a ceiling price to one without, by which the seller demands a total price above the ceiling for the commodity regulated, constitutes an evasion. Defendants further assert that, in any event, even if there was an O. P. A. violation, it would give plaintiff no rights. They argue that since there was a ceiling price of $54,000 for the whisky the only possible breakdown of the combined price of $99,000 is $54,000 for the whisky and $45,000 for the shares. Since the only duty owed by Corn Exchange to plaintiff was under the agreement the latter had with Stein to give him the refusal of the shares at the price that could be obtained from an outsider, it fulfilled that duty by offering the shares to plaintiff at $45,000, the price that could be obtained from Schweidel.

Although an O. P. A. violation (if one occurred) would give plaintiff no rights, since that is something for the Government, there was a failure of good faith and violation of the agreement Stein had with plaintiff (if what plaintiff says is the fact). A reasonable contemplation of the agreement is that the shares would not be submitted as shares plus something else, but

for a separate offer from an outsider, and that opportunity of refusal at the outsider's price be given to plaintiff. If Stein had tied the sale of the shares to the sale of another item without ceiling price for a combination offer only, and then submitted his own breakdown of the respective prices to plaintiff, there is to us little hesitation in judging that there would be disrespect for the agreement. Tying the sale of the shares to the sale of the whisky which had a ceiling price is no less the same. The existence of the ceiling price gave better color to the breakdown, but does not meet the obligation under the agreement to obtain a bona fide separate offer for the shares. Tying in to the sale of another article is obviously not contemplated by the original agreement, and this must be so whether the other article has a ceiling price or not.

It appears thus that there was no separate offer for the shares. The transmission of the offer of $45,000 for the shares was the communication perhaps not of a pretended or fictitious offer, but certainly not an offer for the shares alone. In that respect a deception was practiced upon plaintiff. The elements of deceit are here present:

"In order to maintain an action for deceit, plaintiff must show a fraudulent misrepresentation of fact, made with the intention that it should be relied upon, and that it actually was relied upon to its loss": Warren Balderston Co. v. Integrity Trust Co., 314 Pa. 58, 60 (1934), and see Emery v. Third National Bank of Pittsburgh, 314 Pa. 544 (1934). That there was concealment of material facts as well as positive misrepresentation makes no difference: Thorne's Estate, 344 Pa. 503, 511 (1942). Plaintiff had the right to rely on the representation that the offer was for shares alone. And defendant's misrepresentation need not be the sole reason and inducement for plaintiff's action; it is sufficient if it constituted a material inducement: Mullin v. Gano, 299 Pa. 251, 256 (1930).

Both defendants point out the absence of gain to them from the conduct alleged. Corn Exchange states that plaintiff's pleading showed that it could have gotten $45,000 for the shares from Schweidel under its agreement with him, if plaintiff had not exercised his option, and that it would therefore have received the same total of $99,000 in either event. Schweidel points out that he has paid ceiling price, the maximum allowable for the whisky; that any gain if the price of the shares was high went to the executor, and therefore there should be no recovery as to him. That there was no gain to defendant (or even possibility of gain) is no defense where plaintiff was knowingly and deliberately misled to his loss. Proof of financial gain to a wrongdoer is unnecessary in an action of fraud: Anglo California National Bank of San Francisco v. Lazard et al., 106 F.(2d) 693 (1939). See also Horton v. Tyree, 102 W. Va. 475 (1926), 135 S. E. 597. To warrant recovery for fraud it is unnecessary that defendant secure direct benefit: Blakeslee v. Wallace, 45 F.(2d) 347 (1930).

There were two difficulties in plaintiff's case. One was the omission of plaintiff to let us know when he learned of what his recitation says went on. We suggested a supplemental statement to establish the point of time of plaintiff's knowledge, for obviously he could not complain of doing something despite what his ears had heard. That was done and a supplemental statement of claim was filed stating that plaintiff paid for the shares on August 9, 1943, and learned that which he alleges some four days later, around August 13, 1943.

The other difficulty brings gravest doubt. True it is that there had not been a separate offer for the shares and that plaintiff had matched a seeming separate offer. Defendant broke down the figure of $99,000 (Schweidel's combination offer) into $54,000

for the whisky (ceiling price) and the balance, $45,000, for the shares. Plaintiff, however, makes a breakdown into $20,000 for the shares and the balance, $79,000, necessarily for the whisky. It is plain that the $20,000 figure is arrived at by using the book value of the shares or the speculative "maximum price which any purchaser of the stock alone would be willing to offer on a bona fide trading basis". Plaintiff nowhere makes an averment that there was an offer of $20,000 for the shares by Schweidel, which should have been submitted to him for his refusal. To the contrary, Schweidel's submitted offer was $45,000. Plaintiff asserts that in furtherance of the conspiracy a fictitious and exorbitant price was submitted to him. However, the statement also shows that there is no amount that can be considered a definite offer for the shares alone which should have been transmitted to him in accordance with the terms of the option agreement. What, then, did plaintiff suffer or what injury was produced?

Plaintiff cannot plant a root of damage of his own. He is not entitled to the difference between what he paid and maximum book value on the assumption that such will be the highest outside offer, because book value may not of necessity or even near-necessity represent a true outside offer any more than market value and actual value approximate each other. A third party may well want to pay more than is shown by the books of the company. The fair surmise is precisely that from the realities of the case. Plaintiff must scan his agreement for his remedy, for it must be true to say that without the quoted provision plaintiff has no basis at all for complaint. The remedy is not specified in the agreement.[4] The usual method of ascertaining damages where there has been misrepre-

---

[4] Holmes, J., in 1906 thought contracts rarely attended to non-performance: "Contracts rarely provide in detail for their non-performance": St. Louis Beef Co. v. Casualty Co., 201 U. S. 173, 183.

sentation—a difference between value at time of purchase and the price plaintiff was induced to pay (see Emery v. Third National Bank of Pittsburgh, 308 Pa. 504 (1932), and cases cited)—is here inapplicable. In those cases it is the value which is misrepresented to plaintiff, and in consequence he overpays. Here the value was not misrepresented. Plaintiff had better means of knowing and actually, as the statement shows, did know the value of the shares as well as or better than either defendant. He seeks the difference between what he paid and "fair value". But plaintiff never had the right to acquire the shares at "fair value" or at the price a purchaser "would be willing to pay on a bona fide trading basis". Nor did he have the right to buy at maximum book value as of a certain year, or at a maximum which any purchaser would be willing to offer. He did have the right to match an outside offer, and no more. His right was to have the shares "at the same price as [the selling shareholder] may be able to obtain from any person or persons", and nothing else. No such offer appears in the statement so there is nothing to match. With full knowledge of the value, plaintiff bought, influenced largely (he himself avers) by the desire to keep the Haller Company a closed corporation, and by his distaste for Schweidel.

The "puffed bid" cases cited by plaintiff's counsel do not apply, as here there is no question of a puffed bid. A puffer has no intention of actually buying; here Schweidel concededly would have bought if plaintiff had not. And the principle of Friedman v. Parkway Baking Co., 147 Pa. Superior Ct. 552 (1942), that damages are recoverable even if not calculable with certainty or exactness, if there is no doubt that there has been injury, and reasonable certainty may be reached,[5] is here likewise inapplicable. In the pres-

---

[5] "No formula can be framed, regardless of experience, to tell us in advance when approximate certainty may be attained. The rule of damages must give true expression to the realities of life.

ent case no basis at all for the computation of damages exists. The only possible basis is an outside offer made for the shares separately, and plaintiff does not aver any such offer. If there were such an offer falsely communicated to plaintiff, there would have been a basis.

An apt illustration of what we say is Guffey v. Clever et al., 146 Pa. 548 (1892). A summary of this case by Walling, P. J. (when sitting in Erie County), is found in Curtis v. Buzard, 254 Pa. 61, 62 (1916):

"Guffey leased for oil and gas purposes, a tract of about fifty acres of land from Clever, and as part of the same transaction, he secured from Clever an option giving him the right to lease the adjoining tract for like purposes, and at a price equal to the best terms offered by any other person or persons therefor. Later, when Guffey elected to take the adjoining premises pursuant to the option, Clever falsely informed Guffey that he had a bona fide offer of $20,000.00 for such adjoining premises, by virtue of which false statement, Guffey was induced to pay him that amount, when in truth, his best bona fide offer from any other person was $10,000.00. Guffey thereupon brought an action of deceit against Clever and recovered the $10,000.00 of which he had been defrauded, which was manifestly right, for the fraud he had suffered damages to that amount. *However, in that case prior to the fraud, Guffey had a binding contract entitling him to the adjoining tract at the best price for which Clever could lease the premises to any other person, which best price was in fact, $10,000.00. And after his rights were thus fixed,* he was defrauded of the extra

We do not need to determine what the plaintiff's rights would be if it were able to establish the uniformities which it asserts": Cardozo, J., in Broadway Photoplay Co. v. World Film Corp., 225 N. Y. 104, 108 (1919). See McCormick, The Standard of Certainty in the Measurement of Damages, 43 Yale L. J. 1109 (1934).

$10,000.00 in the manner above stated." [6] (Italics ours.)

A further difference in the Guffey case (other than the existence of a bona fide offer) is that there is nothing to indicate that Guffey knew the value (of the lease) better than defendant; that he bought with full knowledge of its value. This to us is a sharply distinguishing feature of the present situation which can be overcome only by the existence of an actual bona fide outside offer for the shares to serve as a basis for damages.

While the deception that there was a separate offer for the shares was an overreaching giving him the right to rescind [7] when he found there was no such offer, yet at the time plaintiff bought the shares he knew he was overpaying, if he did overpay. He was not deceived as to value but as to a bona fide offer from a third party. In electing to keep the shares he leaves himself without a measure of damages to claim unless there was a definite outside offer.

---

[6] The trial judge in the Guffey case in his charge did say: "If there had been no offer at all made to Mr. Clever, under this contract, the difficulty would not have been very great. In my judgment, the question would then have been, what would have been a fair offer for such property; not what it was actually worth, but what any person might be reasonably expected to offer for it": Guffey v. Clever et al., supra, p. 553. But this portion of the charge was not excepted to and did not reach the Supreme Court, either in discussion or conclusion. The Supreme Court said very simply (p. 560): "If ten thousand dollars was the highest bona-fide offer received by Clever, Guffey was entitled to the lease at that price. If, therefore, he had been induced by the artifice and fraud of Clever to pay twenty thousand dollars, he was entitled to a verdict for the difference between those sums. In view of this, the learned judge was clearly right in rejecting the evidence of the value of the lease, as bearing upon the question of the damages. Whether its intrinsic value was much or little, Guffey was entitled to have it for ten thousand dollars, and he had been compelled to pay double that sum."

[7] This remedy appears no longer available to plaintiff. Affirmance of the contract (as by an action for damages) does not bar recovery; it does bar subsequent rescission: Miller v. Central Trust & Savings Co. et al., 285 Pa. 472, 486 (1926).

"A misrepresentation which, possibly, might not be sufficient to ground an action for damages, may be sufficient to entitle the party deceived to rescind the contract or to defeat, or defend pro tanto, an action upon it": Lake v. Weber, 6 Pa. Superior Ct. 42, 46 (1897).

Suppose there were no offer at all (separate or otherwise) and Corn Exchange submitted a fictitious one. We think that upon discovery plaintiff would be limited to rescission because of his peculiar "insider's" knowledge of the value of the shares.

We cannot concern ourselves with a wrong which, so far as we can see from the pleading, produced no injury. Plaintiff says he paid an outrageous price for the shares but there was no ceiling on the price. Plaintiff would have no basis for any action if not for the pledge in his agreement, and it is to the agreement he must look for his right. That agreement has no ceiling; it does not set book value or any other value upon it. What it does is to give plaintiff a chance to match an outsider's offer whatever the latter is. There was no offer that plaintiff accepted, according to plaintiff. But his damage is not the difference from book value.

As we find it, however, the question before us is not solely whether, under the facts as stated, plaintiff could recover, but whether the claim as stated excludes the possibility of recovery under a better statement of facts: Winters v. Pennsylvania R. R. Co., 304 Pa. 243, 247 (1931). Plaintiff must be afforded the opportunity to amend his statement unless it is clear that he will be unable to state a cause of action. See Adler, Admr., v. Helsel, 344 Pa. 386, 389 (1942).

The question that "the statement of claim filed by the plaintiff is not sufficient in law for the plaintiff to have and maintain its action against this defendant" (Schweidel affidavit), and the question that "the statement of claim filed by the plaintiff, and the mat-

ters therein contained, are not sufficient in law for the plaintiff to have or maintain its action against this defendant" (Corn Exchange affidavit), are sustained.

Leave is hereby given plaintiff to file an amended statement of claim within 15 days hereof, failing which (unless the time is extended) judgment for defendants will be entered.

