SPAETH, J„
NATURE AND HISTORY OF THE CASE
On June 25, 1970, the City of Philadelphia filed a complaint in equity the principal prayer of which is *54 that a “mandatory injunction” be entered directing the Southeastern Pennsylvania Transportation Authority (SEPTA) “to immediately formulate a plan, satisfactory to the Commissioner of Public Property, for the rehabilitation of the Frankford Elevated System and thereafter to carry out such plan of rehabilitation out of funds previously set aside and to be set aside in the future for renewal and replacement of the transit facilities. ...”
SEPTA filed an answer to the complaint, and new matter and a counterclaim. The city filed preliminary objections to the counterclaim, contending that the counterclaim pleaded a cause of action that did not arise from the same transaction or series of transactions as did the cause of action pleaded in the complaint. On October 5th this court filed an order dismissing the preliminary objections, noting, however, in the opinion accompanying the order, that, in part, the order was based upon considerations of practicality, and that “ [i] f at any point the City believes that the presentation of evidence on the counterclaim would encumber and perhaps make awkward the disposition of the complaint, the Court will entertain an application that the counterclaim be severed.”
The city having filed a reply to the new matter and an answer to the counterclaim, the case was called for hearing, and on April 14, 15, 16, 19, and 22, 1971, testimony and argument on the issues presented by the complaint, answer and new matter were heard. As it happened, SEPTA’s counsel on the counterclaim was engaged (SEPTA’s employes had gone on strike), and, with the city’s agreement, the counterclaim was not heard, therefore, in effect, although without formal order, being severed. By May 10th, the city and SEPTA had each filed requests for findings of fact and conclusions of law with supporting briefs and reply briefs.
*55 FINDINGS OF FACT
1. Plaintiff, the City of Philadelphia, is a municipal corporation of the Commonwealth of Pennsylvania and a city of the first class.
2. Defendant, Southeastern Pennsylvania Transportation Authority (SEPTA), is a body corporate and politic organized pursuant to the Metropolitan Transportation Authorities Act of August 14,1963, P. L. 984, as amended, 66 PS §2001 et seq., and has its principal office in Philadelphia.
3. Section 4(a) of said act, 66 PS §2004(a), provides that SEPTA “shall exist for the purpose of planning, acquiring, holding, constructing, improving, maintaining, operating, leasing, either as lessor or lessee, and otherwise functioning with respect to, a transportation system in the metropolitan area [defined in Section 3(a), 66 PS §2003(a), to mean Philadelphia and the area within 20 miles of Philadelphia], ... to the extent necessary for the operation of an integrated system and for the provision of all group and party services which can be provided by transportation systems subject to acquisition under this act...”
4. One of the transportation systems thus subject to acquisition was that operated in Philadelphia by the Philadelphia Transportation Company (PTC). In operating this system, PTC used not only its own transit facilities but transit facilities that it leased from the city.
5. During 1968, PTC, SEPTA and the City entered into a series of agreements to enable SEPTA to acquire the PTC transit facilities and to operate an integrated transportation system as contemplated by the Metropolitan Transportation Authorities Act of 1963, supra. Stated generally, the effect of these agreements was as follows: PTC sold its transit facilities to SEPTA; SEPTA leased the facilities to the city; and the city *56 leased them back to SEPTA, at the same time also leasing to SEPTA the city transit facilities that the city had formerly leased to PTC, this leaseback and lease being stated in an agreement made as of September 27, 1968.
6. Among the city transit facilities thus leased to SEPTA was the Frankford Elevated System. Stated generally, the issue in the present case is whether under the leaseback and lease agreement it is the city’s or SEPTA’s obligation to provide for the rehabilitation of the Frankford Elevated.
7. The Frankford Elevated is approximately six miles long. It was designed and constructed during the period 1914 to 1922, and was opened for operation in 1922.
8. Generally, the design and construction of the Frankford Elevated may be described as follows: The structure may be regarded as a series of connected spans. At the end of each span is a pair of columns, one column on one side of a street for automobiles, the other column on the other side of the street. Seated on top of each pair of columns and extending across the street is a transverse girder. Seated on top of each transverse girder, and extending from one transverse girder to another, in the same direction as the street below, are three parallel longitudinal girders. Each longitudinal girder has a top chord and a bottom chord that are connected by a series of vertical and diagonal web members. Extending between the outside longitudinal girders and encasing portions of the center longitudinal girder is a concrete deck.
9. This design and construction have proved seriously deficient. One principal deficiency is that the structure is not rigid enough, this being so because the girders were seated on top of each other instead of the transverse girders being framed into the columns and *57 the longitudinal girders being framed into the transverse girders. Other principal deficiencies are the encasement of portions of the center longitudinal girder in the concrete deck, resulting in surfaces where dust, dirt, and water collect, and the failure to waterproof the concrete deck.
10. The design and construction of the Frankford Elevated were contrary to practices adopted in the design and construction of other elevated structures built before it, specifically in Boston, Chicago and New York, where (except for a two-mile portion of Chicago’s 36-mile struction) almost all of the longitudinal girders were framed into, rather than seated on top of, the transverse girders, and also in Philadelphia, where the Market Street Elevated was built with a steel floor beneath its concrete deck. The reason for departing from these practices in the design and construction of the Frankford Elevated was to save money.
11. Because of its deficient design and construction, the Frankford Elevated has experienced structural difficulties as follows:
(a) excessive longitudinal and transverse movements of the columns;
(b) jammed expansion joints;
(c) constantly recurring cracking and failure in the end diagonal members of the outside longitudinal girders;
(d) buckling or cracking of the top chords of the longitudinal girders at or near their connection with the transverse girders;
(e) extensive corrosion of the center longitudinal girders at the point where members of those girders are encased in the concrete deck; and
(f) extensive cracking, crumbling and spalling of the concrete deck.
*58 12. At least some of these difficulties, such as jammed expansion joints, have been experienced since the late 1920’s. To date more than 6,000 of the approximately 12,000 members of the center longitudinal girders have been repaired due to corrosion, and 768 out of the approximately 2,500 end diagonal members on the outside longitudinal girders have been repaired due to corrosion or cracking. Although the structure is still safe and useful, it will not be for long unless it is extensively rehabilitated. Indeed, so rapidly are the difficulties with the structure accelerating that the city’s consulting engineer was unwilling to predict for how much longer a period the structure would be safe and useful if it were not rehabilitated, only saying that the period would not be as long as 20 years and decfining to answer whether it would be as long as 10.
13. But for its deficient design and construction, the Frankford Elevated when opened for operation in 1922 would have had a useful life of 75 to 100 years.
14. Since 1955, the Frankford Elevated has been the subject of several engineering studies. Despite these studies, however, no agreement has been achieved with respect to how to rehabilitate it.
15. A report submitted to the city in 1956 recommended that steel links be installed at the fixed joints in the elevated structure. This, however, was an attempt to make the structure more rigid without recognizing its basically deficient design, and so proved unsuccessful. The most recent reports were submitted in 1969, one to the city and one to SEPTA. In the report submitted to the city, an extensive program of bracing was recommended whereby the columns might be held in place. Even with respect to this recommendation, however, the city’s consult *59 ing engineer, who is also the principal member of the firm submitting the recommendation, spoke only in terms of acting “on a trial basis.” The consulting engineer estimated that as of 1968 prices there was “a reasonable chance” that the work recommended would cost $13,000,000, although it might cost less; the city’s chief design engineer put the figure “in the neighborhood” of $13,000,000 to $14,000,000, adding that it “probably is considerably more now.” In the report submitted to SEPTA, a different method of bracing was recommended. The vice president of the firm submitting this report testified that the bracing recommended would cost an estimated $40,000 to $50,000 a section (a section being three to five spans), but that an overall estimate of cost had not been made because it had not been determined how many spans would need to be braced. In addition to the cost of bracing the structure, it will cost, according to the city’s chief design engineer, “probably . . . considerably more” than $20,000,000 (which was an estimate as of 1968 prices) to replace and reinforce corroded and cracked members of the longitudinal girders, to repair cracked and spalling concrete, and to do certain other repairs, such as replacing some catwalks.
16. The city, relying upon a provision in the leaseback and lease agreement that requires SEPTA to maintain the Frankford Elevated, contends that the work needed to be done to rehabilitate the Frankford Elevated should be undertaken by SEPTA; the city further contends that such work should be paid for from a fund that is provided for in the leaseback and lease agreement and that consists of an initial deposit plus a percentage of certain income realized by SEPTA, including income from fares for transportation services. SEPTA acknowledges its obligation *60 of maintenance, and in recognition of this obligation has cleaned and painted a large portion of the Frank-ford Elevated. SEPTA denies, however, that it has any obligation to provide for the rehabilitation of the Frankford Mevated, and contends that if there is to be such rehabilitation, it must be at the expense of the city.
17. The city’s and SEPTA’s disagreement with respect to the rehabilitation of the Frankford Elevated has resulted in their disagreement, and consequent inability to proceed, with respect to other matters affecting the operation of a transportation system in the Philadelphia metropolitan area, as, for example, the purchase of new buses and the improvement of subway stations.
DISCUSSION
There will be no discussion of the findings of fact, for they are based on uncontradicted testimony, a good deal of it by the city’s witnesses; and there will not be much discussion of the law, for the pertinent provisions of the leaseback and lease agreement (which will hereafter be referred to simply as “the agreement”) are clear, indeed, so clear that the mere fact of the present litigation is disheartening, the more so when one reflects that what the city and SEPTA should be doing is working together to promote the public welfare, rather than quarreling.
1. The pertinent provisions of the agreement.
It will be recalled from findings of fact nos. 4, 5 and 6 that SEPTA was enabled to acquire the transit facilities owned by PTC, and to operate them as part of an integrated transportation system, by a series of agreements by which PTC sold its facilities to SEPTA, SEPTA leased them to the city and the *61 city leased them back to SEPTA, at the same time also leasing to SEPTA transit facilities (among them the Frankford Elevated) owned by the city. The facilities thus leased, both the PTC facilities acquired by SEPTA and the facilities owned by the city, are by section 1.02 of the agreement defined as the “Leased Properties.”
Section 1.07 of the agreement defines “Gross Revenues of the Leased Properties” as including “all fares ... for transportation services provided by the Leased Properties” and “[a] 11 other income . . . classified as direct or indirect income from the Leased Properties . . .”
Section 1.10 of the agreement is entitled “Renewal and Replacement of Leased Properties.” Thus, it is at once evident that it will be in section 1.10 that one will find the provisions applicable to the correction of the condition of the Frankford Elevated as described in findings of fact nos. 7 through 15. Although in some of those findings the correction has been referred to as the “rehabilitation” of the Frank-ford Elevated, and although the city’s complaint prays for an order “directing the defendant to immediately formulate a plan ... for the rehabilitation” of the Frankford Elevated, the findings and complaint could as well have used the phrase “renewal,” for “renewal” and “rehabilitation” include, among their several meanings, meanings that are synonymous.
In Webster’s Third New International Dictionary, at page 1922, the fourth meaning of “renewal” is
“something used for renewing; specif: an expenditure that betters (as by prolonging useful lives, increasing output) existing fixed assets and is usu. capitalized in the accounts — usu. used in pi; compare REPAIR, REPLACEMENT,”
and, at page 1914, the first meaning of “rehabilitation” is:
*62 “the action or process of rehabilitating or of being rehabilitated: as . . . the restoration of something damaged or deteriorated to a prior good condition: improvement to a higher level or greater value < the — of devastated libraries — of buildings in a slum area >
The immediate indication from the title of section 1.10 that the section applies to the rehabilitation of the Frankford Elevated is confirmed as one proceeds into the section. Thus, section 1.10(a) provides that SEPTA “shall establish a Renewal and Replacement Fund and shall deposit therein (i) when this Lease becomes effective, $5,000,000 and (ii) thereafter, percentages of the Gross Revenues from the Leased Properties [which percentages may not exceed 7% without SEPTA’s and the City’s consent]
and section 1.10 (b) provides that SEPTA “shall use the Renewal and Replacement Fund for the renewal and replacement of the Leased Properties. If, in order to provide for adequate and orderly renewals and replacements, financing becomes necessary or desirable, the City shall provide such financing through the issuance of self-supporting bonds [SEPTA’s payments under the agreement then being increased by amounts equal to the interest and principal payments on the bonds] . . .”
As one reads these provisions, one might ask: But what happens if there is disagreement regarding what constitutes “adequate and orderly renewals and replacements?” This question was anticipated by the draftsmen and is answered by section 1.10(d), which provides:
“The Authority [SEPTA] shall determine what *63 capital improvements,[1] renewals and replacements on the Leased Properties should be made; but if the City is of the opinion that a particular capital improvement, renewal or replacement on the Leased Properties of a material nature should not be made or that a capital improvement, renewal or replacement on the Leased Properties not desired by the Authority should be made, the matter shall be submitted to the Service Standards Committee, whose decision shall be binding, but in no event shall the Authority be required to make capital improvements, renewals and replacements on the Leased Properties involving payments or commitments in excess of the amounts available from the Renewal and Replacement Fund. Whenever the City and the Authority agree that an expenditure for a capital improvement, or for a renewal or replacement on the Leased Properties is to be made and the amount of such expenditure is in excess of $500,000, City Council shall be informed.”
It would be difficult to draft clearer or more straightforward provisions: The Frankford Elevated is one of the “Leased Properties.” Initially it is SEPTA’s responsibility to determine what should be done to rehabilitate the Frankford Elevated. If the city disagrees, the matter shall be submitted to the Service Standards Committee. Such rehabilitation as the committee directs shall be paid for from the Renewal and Replacement Fund. As this fund consists, except for an initial deposit, of a percentage of fares and other income, it may be inadequate, in which case, if necessary or desirable, it will be supplemented by funds realized from the issuance *64 of city bonds, SEPTA to reimburse the city for the interest and principal expense of the bonds.
It remains to inquire why neither the city nor SEPTA has abided by these provisions.
2. The City’s argument.
The city bases its action on section 1.12 of the agreement,[2] which provides as follows:
“Maintenance of Leased Properties. The Authority [SEPTA] is taking possession of the Leased Properties directly from PTC on an “as is” basis, and neither the City nor the Authority makes any representation as to the condition thereof. Subject to the provisions of Section 1.10, the Authority shall maintain the Leased Properties in good and safe operating condition. The Authority’s standards of maintenance of the City Properties shall be subject to review by the Service Standards Committee.”
According to the city, these provisions require SEPTA “to put the Frankford Elevated in good and safe operating condition, to keep it in that condition and ultimately, to return it to the City at the termination of the lease in that condition.”
There is no merit in these contentions.
To “maintain” a structure is not to put and then to keep it in good condition, but only “to keep [it] in a state of repair, efficiency or validity: preserve from failure or decline”: Webster’s Third New International Dictionary, at page 1362. SEPTA has maintained the Frankford Elevated, having painted and cleaned a large *65 portion of it: Finding of fact no. 16. The condition of the Frankford Elevated is not attributable to a failure of maintenance but to deficient design and construction: Findings of fact nos. 7 through 15. Accordingly, to correct this condition cannot be described as a matter of “maintenance”; it can, however, be described as a matter of “rehabilitation,” as the city itself has described it in the prayer of its complaint; or it can be described as a matter of “renewal,” as was seen above when discussing the meaning of “rehabilitation” and “renewal.” The obligation to provide for renewal, however, is imposed not by section 1.12 but by section 1.10, which imposes it not on SEPTA, but, pursuant to specified procedures that may involve the Service Standards Committee, on both SEPTA and the city.
The city asserts that there are cases holding that an obligation to maintain includes an obligation to rehabilitate or renew, even where, as in the present case, renewal means extensive structural work required because of deficient design and construction. No purpose would be served by discussing the cases cited by the city; they are adequately distinguished in SEPTA’s reply memorandum;[3] and they are, in any event, not in *66 point, for the agreement between the city and SEPTA does not impose a single obligation of “maintenance” but separate and differing obligations, one of “maintenance” (section 1.12) and the other of “renewal” (section 1.10), the draftsmen of the agreement, and the city and SEPTA as parties to the agreement, thus demonstrating that they did not intend “maintenance” to include “renewal.” Indeed, this intention is stated with emphasis. Section 1.12 does not provide that SEPTA “shall maintain the Leased Properties in good and safe operating condition,” but that “[s]ubject to the provisions of Section 1.10, [SEPTA] shall maintain the Leased Properties in good and safe operating condition.”
By this cross-reference, the draftsmen anticipated two possible, and precisely converse, contentions: by SEPTA, that the obligation to provide for renewal includes the obligation to provide for maintenance, and that, therefore, SEPTA should be allowed to pay for maintenance from the Renewal and Replacement Fund, which the city may be required to supplement from proceeds realized from the issuance of city bonds; and by the city — the very contention that it makes in the present case — that the obligation to provide for *67 maintenance includes the obligation to provide for renewal, and that, therefore, the city should be freed from any obligation with respect to renewal, and that obligation should be imposed on SEPTA alone. The cross-reference ensures the futility of these contentions, which would shift the obligation of one party to the other; for it makes plain that the obligation to provide for maintenance and the obligation to provide for renewal are distinct, and neither is included in the other.
3. SEPTA’s argument.
Not only the city has attempted to avoid the applicability of section 1.10; so has SEPTA.
SEPTA agrees that to correct the condition of the Frankford Elevated is a matter of rehabilitation or renewal, and so is a matter at least initially within section 1.10. SEPTA points, however, to section 1.10(e), which provides that “this Section 1.10 [shall not] relieve the City from the obligation to make renewals and replacements at its own expense to the extent provided in Section 1.18(b).”
Section 1.18(b) provides:
“If any of the City Properties is damaged or destroyed by an Extraordinary Casualty (as hereinafter defined) not covered by insurance, the City will bear the costs of restoration and replacement except that the City shall not be required to undertake any restoration or replacement which it in good faith determines will cost it more than $5,000,000. If, as a result of an Extraordinary Casualty or the loss of revenue or claims for injury to persons or damage to property associated therewith, the Authority is unable to pay the Fixed Rent in full, such failure, to the extent attributable to such casualty, shall be excused and shall not be a default under this Lease. For purposes of this paragraph, Extraordinary Casualty shall mean war, riot, civil disorder, flood, earthquake, the bursting or leaking of water or gas *68 mains or sewers, and any other casualty comprehended under the term “Act of God,” but shall not include any casualty which is proximately caused by negligence of the Authority. Extraordinary Casualty shall also include in the case of Leased Properties designed or constructed by the City defects in design, materials or construction. If the Authority elects to pay any costs which the City is required to pay under this paragraph, the amount thereof shall be repaid to it by the City, or the Authority may deduct the same from the Fixed Rent.”
SEPTA’s argument is that the record demonstrates that the Frankford Elevated, one of the “Leased Properties designed or constructed by the City,” “is damaged” “by an Extraordinary Casualty,” i.e., “by defects in design ... or construction,” and that therefore the City, not SEPTA, must, without reference to the Renewal and Replacement Fund required by section 1.10, “bear the costs of restoration and replacement [unless the costs are more than $5,000,-000].”
In resisting this argument, the city has contended that the Frankford Elevated is not suffering from “defects in design ... or construction” but was construed in accordance with engineering standards of the day. In reply, SEPTA has contended that “defects” must be read in an experiential sense, and that as a matter of experience the design and construction have proved to be defective, but that if “defects” is to be read as referrring to engineering standards of the day, still the design and construction were defective, in which connection SEPTA has noted, among other matters, the evidently sounder design and construction of other, older, elevated structures. It is unnecessary to resolve this issue. For the sake of argument, it may be assumed that SEPTA is correct *69 in one or the other of its interpretations of “defects.” Section 1.18(b) remains irrelevant.
This is so because the Frankford Elevated has not been “damaged” by “defects in design ... or construction.” Defects cannot cause damage. Damage is caused by an event. If the structure on which the event impinges is defective in design or construction, the event may cause damage, whereas, had the structure not been defective, there might have been no damage.
The correctness of the conclusion that section 1.18(b) becomes relevant only when there has been an event that has caused damage is confirmed by comparison with the other, and preceding, parts of section 1.18.
Section 1.18 is entitled “Liability for Injury or Damage to Persons and Property — Extraordinary Casualty.” Beneath this title are two subsections: (b), which has just been quoted above, and (a), which provides:
“The Authority shall indemnify the City against all claims for injury or damage to persons or property arising out of the operation or maintenance of the Leased Properties or resulting from any act or omission of the Authority, its agents, servants or concessionaires, in the use of the Leased Properties or from any negligence on its or their part or from any cause, whether or not attributable to the design, materials or construction of the Leased Facilities, which could have been prevented or avoided by the ordinary diligent and careful maintenance and use thereof; and the Authority shall bear all costs in connection with defending said claims. The indemnity provided in this paragraph is solely for the benefit of the City and shall not confer any rights on any other person.”
Thus, it is clear that section 1.18 by its two sub *70 sections defines the city’s and SEPTA’s respective obligations when one of two different, and contrasting, events occurs: subsection (a): when SEPTA has been at fault, in which case it must indemnify the city; this obligation pertains to claims for injury or damage, both to persons and property, including any of the city properties, “whether or not attributable to the design ... or construction of the Leased Facilities;” and subsection (b): when any of the city properties has been damaged or destroyed by an “Extraordinary Casualty,” in which case the city “will bear the costs [unless more than $5,000,000]”; in order to preserve the relationship of this obligation to that imposed by subsection (a), “Extraordinary Casualty” is defined to “include in the case of Leased Properties designed or constructed by the city ‘defects in design ... or construction.’ ” Thus, for example: If an event occurs that results in damage to one of the city properties, which damage would not have ensued but for a defect in the design or construction of the property, SEPTA is not financially responsible, unless it was at fault. This is plainly sensible; it is not, however, relevant to the present case; for the feature common, both to subsections (a) and (b), is that an event must occur; and here none has.[4]
*71 4. The City’s claim with respect to the purchase of new buses.
Paragraph 13 of the complaint alleges that “despite the fact that [the City] has objected . . . , [SEPTA] has proceeded to purchase [from funds in the Renewal and Replacement Fund] . . . new buses without the consent of [the City] and without having submitted the matter to the Service Standards Committee, as required by Section 1.10(d) . . .”
And paragraph 2 of the city’s prayer asks that the court “[e]nter an order forbidding [SEPTA] from expending any funds from the Renewal and Replacement Fund for capital improvements or for renewals and replacements other than the rehabilitation of the Frankford Elevated, without the consent of [the City] or a decision of the Service Standards Committee.”
The claim thus presented is without basis in fact or law, and the city’s determination to press it is perhaps the most disheartening aspect of this disheartening litigation.
The claim is without basis in fact because, as SEPTA pleaded and proved, the city, by letter of January 28, 1970, from Fred T. Corleto, Managing Director, to James C. McConnon, Chairman of SEPTA, approved the very purchase of buses of which it now complains.
The claim is without basis in law because section 1.10 does not support but, rather, demonstrates the unsoundness of the city’s contention that unless the city agrees otherwise, funds in the Renewal and Replacement Fund may not be applied to projects other than the rehabilitation of the Frankford Elevated.
Section 1.10(b) provides that SEPTA “shall use
the Renewal and Replacement Fund for the renewal and replacement of the Leased Properties,” i.e., for
*72 one, some or all of the leased properties. Comparably, section 1.10(d) provides that SEPTA “shall determine what capital improvements, renewals and replacements on the leased properties should be made.” There is nothing to suggest that among the various leased properties the Frankford Elevated is to be given any priority. Moreover, it is otherwise apparent that the Frankford Elevated is not to be given any priority.
In section 1.02 the “leased properties” are defined to include, not only the transit facilities that SEPTA acquired from PTC, and the transit facilities (among them the Frankford Elevated) owned by the city, but also “all renewals and replacements [of the City and former PTC facilities].” Section 1.10(d) provides that if SEPTA and the city cannot agree upon “what capital improvements, renewals or replacements on the leased properties should be made, the matter should be submitted to the Service Standards Committee, whose decision shall be binding, but in no event shall [SEPTA] be required to make capital improvements, renewals or replacements on the Leased Properties involving payments or commitments in excess of the amounts available from the Renewal and Replacement Fund ...”
As one considers these provisions, one cannot help but ask: But what happens if the Renewal and Replacement Fund is not large enough to permit renewal or replacement of all of the leased properties although large enough to permit renewal or replacement of one or some of them? If the provisions are to make sense, the answer to this question must be that the Service Standards Committee is empowered, in making its decisions, to determine priorities, for example, as between a claim that the Frankford Elevated should be renewed and a claim that another of the leased properties should be, such determination to be *73 made after considering “the amounts available from the Renewal and Replacement Fund” as between the competing claims.
One further observation is in order: The letter of January 28, 1970, demonstrates that the contentions now made by the city and SEPTA are afterthoughts. The letter reads as follows:
“Dear Mr. McConnon:
“As a result of a meeting held in my office on December 11,1969, with representatives of the City and representatives of SEPTA, I am confirming herewith the understanding which was reached at that time:
“1. The cost of rehabilitating the Frankford Elevated System, estimated to aggregate $14,280,000 as shown in SEPTA’s six-year capital program ending June 30, 1975, will be paid out of SEPTA’s Renewal and Replacement Fund. If, in order to provide for such rehabilitation and other work properly to be provided for by the Renewal and Replacement Fund, financing becomes necessary or desirable, the City will provide such financing through the issuance of self-supporting bonds, in which case the provisions relating thereto contained in Sections 1.10(a) and (b) of the City-SEPTA Transit System Lease will apply. Due to the immediate urgency of the work, it is imperative that the work proceed without delay.
“2. The City approved the purchase of 100 new air-conditioned transit buses by SEPTA, the cost of such buses to be charged against the Renewal and Replacement Fund.
“If you agree with this understanding, will you please sign the copy of the letter I am attaching and return it to me at your earliest convenience.
“Sincerely yours,
“s/Fred T. Corleto Managing Director”
*74 Thus: The city in this letter adopted a view of its obligations entirely contrary to the contentions that it has made in the present case: It did not contend that SEPTA’s obligation of “maintenance” under section 1.12 had anything to do with the obligation to provide for the rehabilitation of the Frankford Elevated, agreeing, to the contrary, that the cost of such rehabilitation should be paid from funds in the Renewal and Replacement Fund supplemented, if necessary or desirable, by funds realized from the issuance of city bonds; nor did the city contend that the cost of such rehabilitation should be paid from the Renewal and Replacement Fund before the cost of new buses, agreeing, to the contrary, that both costs should be paid from the fund. Comparably, SEPTA in the letter adopted a view of its obligations, while not entirely, nevertheless partly, contrary to the contentions that it has made in the present case: It did not attempt to repudiate the agreement in the letter that the cost of the buses should be paid from the Renewal and Replacement Fund; however, it did not contend in the letter that the city’s obligations under section 1.18(b) with respect to bearing the costs of an “Extraordinary Casualty” had anything to do with the obligation to provide for the rehabilitation of the Frankford Elevated, agreeing, to the contrary, that the cost of such rehabilitation should be paid from the Renewal and Replacement Fund.
As stated at the outset of this discussion, the pertinent provisions of the agreement between the city and SEPTA are clear. It may now be seen from the letter from Mr. Corleto to Mr. McConnon that, before quarreling, so did the city and SEPTA find those provisions clear. In addition, however, it may be noted that if the provisions were in some respect not clear, the construction put upon them by the city and SEPTA, and stated in the letter, would be of considerable significance. Thus, it has been said, collecting cases:
*75 “When the language of a contract is ambiguous or uncertain, or the meaning doubtful, weight and effect will be given to the construction placed upon the contract by the parties themselves, the court assuming that such construction represents the true understanding of the parties. Normally such construction is binding upon the parties, and will be enforced, although it may not have been the construction which the court would have adopted.
“The construction of the contract by the parties themselves is ff equendy designated as the practical or contemporaneous interpretation. This interpretation is entitled to great, if not controlling, influence, and will generally be adopted and followed by the courts, particularly when the parties’ interpretation is made before any controversy”: 8 P.L.E. Contracts §141, at 172-73 [citations omitted].
It seems reasonably apparent that what has occurred is somewhat as follows: Some time after the letter of January 28, 1970, the city and SEPTA, for reasons not apparent of record, quarreled. Thereupon, each repudiated its obligations under section 1.10 with respect to the rehabilitation of the Frankford Elevated. Casting about for a basis of this repudiation, the city hit upon section 1.12, and SEPTA upon section 1.18(b). It is now necessary that both the city and SEPTA return to section 1.10, and fulfill their obligations under it.
5. What is the appropriate remedy ?
In enacting the Metropolitan Transportation Authorities Act of 1963, supra, the legislature, in section 2, 66 PS §2002, “determined and declared”:
“(a) That there exists in the urban and suburban communities in metropolitan areas, traffic congestion and serious mass transportation problems because of underdeveloped, uncoordinated obsolete mass transportation facilities . . . ;
*76 “(b) That such conditions. . . have made. . . such communities economic and social liabilities . . . ;
“(c) • • • ;
“(d) That the sound replanning and redevelopment of metropolitan mass transportation facilities in accordance with sound and approved plans for their promotion, development and growth will promote the public health, safety, convenience and welfare . . . ;
“(e) That the well-being and economic health of the counties and other communities in the metropolitan areas require integrated systems of mass passenger transportation;
“(f) . . . ;
“(g) • • • ;
“(h) . . . ;
“(i) That it is intended that any authority created hereunder will cooperate with all municipalities and other public bodies in whose territories it operates so that the mass passenger transportation system may best serve the residents thereof...”
The realization of the objectives thus expressed has been, and is being, frustrated by the conduct of the city and SEPTA in the present case. Because of their inability to cooperate, and their refusal to fulfill their obligations as specified in section 1.10 of the agreement with respect to the rehabilitation of the Frankford Elevated, not only has that rehabilitation not proceeded, but so have other matters affecting the operation of a transportation system in the Philadelphia metropolitan area not proceeded, as, for example, the purchase of new buses and the improvement of subway stations. Thus, the transportation system continues to be “underdeveloped” and “obsolete”; “sound and approved plans” for its “development and growth” cannot be made; and the residents of the area that should be served continue to suffer.
*77 Some indication of the extent of these consequences is given by paragraph 7 of the complaint, which alleges:
“In the event of interruption of service on the Frankford Elevated, a large number of persons who depend upon the same for daily transportation will be greatly inconvenienced and delayed in reaching their places of employment. There is no other means of mass transportation presently available to carry this traffic, which amounts, during rush hours, to as many as 18,000 persons per hour in one direction.”
SEPTA’s only answer being:
“The allegations of paragraph 7 are admitted except it is averred that bus routes operated by SEPTA provide other means of mass transportation in and through the area served by the Frankford Elevated System.”
No evidence was offered, or argument made, that such bus routes are adequate to replace the services provided by the Frankford Elevated.
Thus, it is beyond question that the present deadlock between the city and SEPTA must be broken, and that the city and SEPTA must proceed to conduct themselves in a manner consistent, both with their obligations under the agreement, and with the realization of the objectives determined upon and declared by the Legislature in the Metropolitan Transportation Authorities Act of 1963, supra. It would, however, be idle to expect such conduct to ensue simply upon a dismissal of the complaint. Before receiving testimony, the court expressed in vain its hope that litigation of such public importance might be amicably resolved; and, as has been remarked, the litigation itself, and the nature of the several contentions made, demonstrate that the relationship between the city and SEPTA has deteriorated to the point where they *78 cannot work together. Accordingly, the court will retain jurisdiction, and will enter a decree that will require the city and SEPTA to proceed with the rehabilitation of the Frankford Elevated as provided by section 1.10. This is but an application of the established principle, stated, for example, in Long v. Trader Horn Coal Co., 396 Pa. 203, at 205, 152 A.2d 257, at 259 (1959), that once the jurisdiction of equity has attached, it “will be retained for all purposes so as to do complete justice: Milasinovich v. The Serbian Progressive Club, Inc., 369 Pa. 26, 84 A.2d 571 (1951); Commonwealth of Pennsylvania, Department of Public Assistance v. Smith, et al., 344 Pa. 381, 25 A.2d 694 (1942).”
And see Wortex Mills v. Textile Workers Union of America, 380 Pa. 3, 11-12, 109 A.2d 815, 189 (1954), collecting authorities.
In this connection it should be noted that the city, perhaps anticipating the court’s decision, has contended that it need not assist with the rehabilitation of the Frankford Elevated. It will be recalled that section 1.10(b) provides that SEPTA “shall use the Renewal and Replacement Fund for the renewal and replacement of the Leased Properties. If, in order to provide for adequate and orderly renewals and replacements, financing becomes necessary or desirable, the City shall provide such financing through the issuance of self supporting bonds [SEPTA’s payments under the agreement then being increased by amounts equal to the interest and principal payments on the bonds] . . .”
The city, however, has contended that nevertheless it need not issue bonds, and has cited the second sentence of section 1.10(c), which provides that:
“If the City neglects or refuses to provide such financing, or if the parties agree that another source *79 of financing is preferable, [SEPTA] may obtain financing for renewals and replacements from another source . .
It would be inappropriate, as premature and so advisory, for the court to comment upon the relationship between section 1.10(b) and section 1.10(c). It is true that the city’s citation of section 1.10(c) might be construed as a threat that it will in no event assist in the rehabilitation of the Frankford Elevated. The court, however, declines to adopt this construction but will act in the expectation that as the city and SEPTA are required to proceed in accordance with section 1.10(d), their representatives will happily discover an ability to arrive at solutions consistent with the public welfare, and so with their professional honor.
CONCLUSIONS OF LAW
1. The court has jurisdiction of the parties and of the subject matter.
2. Section 1.12 of the leaseback and lease agreement between the city and SEPTA made as of September 27, 1968, does not impose upon SEPTA the obligation to provide for the rehabilitation, or renewal, of the Frankford Elevated.
3. That obligation is imposed upon the city and SEPTA by section 1.10 of the agreement.
4. Under section 1.10(d), initially it is SEPTA’s responsibility to determine what should be done to rehabilitate the Frankford Elevated. If the city disagrees, the matter shall be submitted to the Service Standards Committee, whose decision shall be binding. In making this decision, the committee shall consider what amounts are available from the Renewal .and Replacement Fund required by section 1.10(a), both for the rehabilitation of the Frankford Elevated and for such other projects as are within *80 section 1.10. Certain other provisions of the agreement may bear upon the committee’s decision; however, it would be premature for the court to make any findings of fact or conclusions of law with respect to such provisions before the procedures required by section 1.10(d) have been completed.
5. If the public welfare is to be served and complete justice done, it is necessary that the court retain its jurisdiction at least until the procedures required by section 1.10(d) have been completed.
DECREE NISI
And now, June 3,1971:
1. SEPTA, with the aid of appropriate engineering advice, shall promptly determine what capital improvements, renewals and replacements on the Frankford Elevated System should be made. Such determination shall be made by September 1, 1971, unless after application, and, if necessary, hearing, the court fixes a different date.
2. Upon making such determination, SEPTA shall forthwith communicate it to the city, with a copy of all supporting data. Thereupon the city shall promptly determine if it is of the opinion that a particular capital improvement, renewal or replacement on the Frankford Elevated System of a material nature should not be made or that a capital improvement, renewal or replacement on said system not desired by SEPTA should be made. Such determination shall be made by December 1, 1971, unless after application, and, if necessary hearing, the court fixes a different date.
3. If the city is of the opinion that a particular capital improvement, renewal or replacement on the *81 Frankford Elevated System of a material nature should not be made or that a capital improvement, renewal or replacement on said System not desired by SEPTA should be made, the matter shall forthwith be submitted to the Service Standards Committee.
4. The court will retain jurisdiction until, pursuant to the foregoing procedures, the city and SEPTA have come to an agreement, or, if no such agreement is achieved, the matter has been submitted to and decided by the Service Standards Committee, in which case the court will determine what further action, if any, it should take according to the circumstances that then appear.
5. Either the city or SEPTA may file exceptions within 20 days. If neither does, the prothonotary shall on praecipe enter this decree nisi as the final decree.

 The italicized portions of the subsection are as in the copy of the agreement attached to the complaint; no reason for the emphasis appears.

 The city in its complaint also cites and quotes section 1.10 of the agreement. During the hearing and in arguments and briefs, however, the city abandoned whatever may have been the theory of its complaint and relied entirely upon section 1.12. See, e.g., the city’s brief at page 11:
“The City’s position is that SEPTA’s promise and covenant in this Section [1.12] provides the exclusive basis for the obligation to do the work needed to be done to the Frankford Elevated.”

 See Hampers v. Darling, 194 Pa. Superior Ct. 59, at 62, 166 A.2d 308, at 310 (1960), where it is said:
“The phrase ‘to maintain and keep in good repair’ implies the preservation of the status quo, or a restoration approximately to the original condition, natural wear and tear excepted. We do not construe these words in the lease as being synonymous with the term ‘replace.’ In Pennsylvania Railroad Co. v. Pennsylvania-Ohio Electric Co., 296 Pa. 34, 45, 145 A. 686, the Supreme Court, in construing the phrase ‘maintain, repair and renew’ stated: ‘Each word is presumed to have some meaning, and to ‘renew’ naturally means to make new again, while to repair is to mend ... It must have been in contemplation of the parties that in time the bridge, exposed to wear, strain and the elements, would give out and require replacement. In other words, that it must be renewed, and for that the contract provides.’ ”
This statement is in accordance with the general common-law
*66 rule. See 51 C.J.S., Landlord & Tenant, §366(1), at 931, where it is said [omitting citations] :
“In the absence of any express agreement, the tenant is bound to use the premises in a tenantlike manner, and to make the smaller or ordinary, repairs necessary to keep the buildings on the premises wind- and water-tight, such as ordinary repairs to the roofs of buildings, to prevent leakage, and, in the lease of a farm, to make repairs generally, or to keep the fences in ordinary repair.
. . . However, the tenant is not at common law impliedly liable for the ordinary or reasonable wear and tear of the premises, or to replace, with new, old materials worn out. Also, the tenant ordinarily has no obligation to make substantial and lasting repairs, such as are usually called ‘general repairs,’ or to undertake extraordinary and costly construction, ...”

 It should perhaps be observed that in consequence the court’s findings (findings of fact Nos. 7 through 15) that the condition of the Frankford Elevated is attributable to deficient design and construction have nothing to do with section 1.18. Had an event occurred within section 1.18, those findings would have been pertinent in considering whether the “Extraordinary Casualty” clause applied, and the argument about whether “defects in design . . . or construction” refers to engineering standards of the day or is to be read in an experiential sense would have had to be decided. As no event has occurred, the sole significance of the findings is that it follows from them, as has been discussed, that to correct the condition of the Frankford Elevated is not a matter of “maintenance” within section 1.12 but of “renewal” within section 1.10.