**Petrecca v. Allstate Insurance Co.**

*Jonathan Wheeler,* for plaintiffs.
*Robert G. LaBar,* for defendant.

COHEN, *J.,* July 9, 2001—On March 19, 2001, the court, sitting without a jury, after hearing testimony in this bad faith and breach of contract matter entered a

verdict in favor of the plaintiffs in the amount of $12,091 plus interest on the breach of contract claim and $4,231 in counsel fees on the bad faith claim along with $36,273 in punitive damages applying to the bad faith claim. The defendant filed timely post-verdict motions which the court by accompanying order has denied. The following are the court's reasons for denying post-verdict motions and upholding the verdict.

## FACTS

The plaintiffs own a home in Langhorne, Pennsylvania. Prior to October 1998, the house had been free of any "problems, leaks, seepage, anything having to do with the master bedroom . . . ." (N.T. 3/16/2001 p. 19.) On October 18, 1998, Mrs. Petrecca returned home to find "part of the ceiling on my kitchen floor and table, part of the ceiling was cut out. We had water on our kitchen floor underneath our table. And in the corners there were all kinds of dirt in the floor, debris from what occurred." (*Id.* p. 25.) Seeing the damage Mrs. Petrecca and her husband reacted by notifying a Mr. Kaufmann. (*Id.* p. 27.) This Mr. Kaufmann came out and "he told us what our damages was [sic], what our damages were and that he would be representing us with our insurance company." (*Id.* p. 28.)

The Petreccas maintained homeowners insurance through defendant Allstate Insurance Company. By December 28 Allstate had denied their claim for coverage. The Petreccas maintained that other than the December 28, 1998 letter Allstate never gave them any reasons for the denial of the claim. (*Id.* p. 34.)

When the Petreccas reported a claim to Allstate they stated that a pipe in the master bathroom broke causing damage. The aforementioned Mr. Kaufmann, a public

adjuster who was experienced handling water damage claims for a large insurance company, testified as an expert and as a material witness. He stated that he observed water with a "definitive trail which came from a bathroom above, went right down the kitchen, damaged the wall. There was some damage to the flooring in the kitchen area . . . . It was, you know, a routine water loss." (*Id.* p.66.) Mr. Kaufmann determined the loss to be "sudden and accidental." (*Id.* p. 66.) Further, Mr. Kaufmann called the Petreccas' loss "unforeseen." (*Id.* p. 68.) Mr. Kaufmann performed a detailed estimate of the damage (see plaintiffs' exhibit no. 8) which he articulated on the record. (*Id.* pp. 69-77.) Mr. Kaufmann negotiated on behalf of the Petreccas with an adjuster from Allstate named Mike Trump. At the time "Mike Trump as well as a lot of other Allstate adjusters weren't paying routine water damage claims that they had paid for the last 50 years." (*Id.* p. 80.) Mr. Kaufmann made two initial appointments with Mr. Trump so that they could jointly inspect the Petreccas' water damage. However, the appointments—scheduled for October 30 and November 9, 1998—were unilaterally canceled. (*Id.* pp. 81-82.) According to Mr. Kaufmann the Petreccas complied with all of the policy terms and conditions in connection with the submission of their claim. (*Id.* p. 95.) Mr. Trump and Mr. Kaufmann's brother, Charlie, together inspected the Petreccas' home on November 16. (*Id.* p. 83.) However, the Petreccas were not asked to provide a proof of loss because "there was no settlement in the case . . . . Proof of loss is filed after a claim has been agreed to, amounts of loss have been determined." (*Id.* p. 95.)

Defendant pressed home its contention that the damage to the Petreccas' home, particularly in the bathroom,

was pre-existing or the result of wear and tear. (*Id.* pp. 98-123.) Nonetheless, plaintiff Daniel Petrecca reasserted the plaintiffs' contention that the house was in "good condition" before October 1998 and free of any water damage to the kitchen and the bathroom. (*Id.* pp. 129-32.) Mr. Petrecca also testified that on October 18, 1998, when he and his wife returned home there was "an obvious hole in the ceiling . . . [with] pieces of drywall left on the kitchen table which was right beneath the hole and also on the floor." (*Id.* p. 133.) Mr. Petrecca, too, characterized the denial letter that he and his wife received from Allstate as "very ambiguous." (*Id.* p. 139.) He claimed he fully cooperated with Allstate in pursuing his claim. (*Id.* p. 140.) On cross-examination Mr. Petrecca reasserted his response to interrogatories dealing with the cause of the damage, which was in his view "the tub shank in [the] bathroom broke causing a leak." (*Id.* p. 144.)

The plaintiff presented as of cross-examination the testimony of Michael Trump, the Allstate representative who sent the denial letter (P-3) to the plaintiffs. Examination of Mr. Trump established that the only condition of the Petreccas' policy which the plaintiffs allegedly failed to honor in the view of Allstate was a condition stated in sub-paragraph (f) which requires the claimant to "show us the damaged property." Mr. Trump claimed that although he was present at the Petreccas home on November 16, 1998, he was not shown the drain assembly and the water damaged drywall. (N.T. 3/19/2001 p. 7.) However, the denial letter only generally stated that the Petreccas failed to comply with the policy conditions. Mr. Trump was informed of the nature of the work done by a plumber who visited the Petreccas' home but never called him to discuss his findings. (*Id.* p. 15.)

6

The plaintiffs presented the testimony of the plumber, Mr. Joseph Eisenman. (*Id.* pp. 16-35.) Mr. Eisenman testified that when he visited the Petreccas' home in November 1998, he observed a leak emanating from the shoe and connecting pipe that is part of the bathtub assembly. (*Id.* p. 23.) The repair necessitated replacing the entire tub assembly, because in his efforts to stem the leak Mr. Eisenman inadvertently broke the tub. (*Id.* pp. 23-25.)

The plaintiff called James McMahon, the claims representative with Allstate who had verified Allstate's answer to the complaint. Mr. McMahon stated that his verification was based upon his review of the claim file which showed that it was in his view "unnecessary" for the plumber to have ripped out the whole bathroom because "there were areas in the bathroom that were undamaged and that even assuming the tub had to be replaced, that some of the repairs listed, that we felt—at least the repairs listed on the public adjuster's estimate were unnecessary and unwarranted." (*Id.* pp. 41-42.) While Allstate initially believed that the adjuster's report of the date of the loss as October 23, 1998 rather than October 18, 1998 was a material misrepresentation, Mr. McMahon withdrew that claim from the witness stand. (*Id.* pp. 46-47.) Indeed, the court granted the plaintiffs' verbal request to amend the complaint stating the accurate date of loss. (*Id.* p. 53.)

After calling Mr. Trump in their own case (*id.* pp. 54-76) the defense called as an expert a William Furino. Mr. Furino was a master plumber. In his testimony (*id.* pp. 77-91) Mr. Furino questioned the extent of the plumbing work that the Petreccas' contracted for with Mr.

Eisenman opining that it was out of proportion to the extent of the damage upon which the Petreccas' claim was based.

## DISCUSSION

### 1. *Defendant Is Not Entitled to a Jury Trial in a Bad Faith/Breach of Insurance Contract Action*

Prior to trial the court held that this matter must be tried non-jury because the defendant failed to file a timely motion for severance and because the law requires that bad faith claims must be heard non-jury. See *Mishoe v. Erie Insurance Co.,* 762 A.2d 369 (Pa. Super. 2000).

The Constitution of the Commonwealth of Pennsylvania affords litigants the right to a jury. However, this right only applies to actions brought in law that existed at the time the constitution was enacted—1776—or where statutorily granted thereafter. Does a party enjoy the right to a jury trial where the plaintiff brings an action in both contract and bad faith?

Although the law is clear that a jury trial is not available in a court of equity, it is not explicit in the situation where a party files a lawsuit which incorporates both a count in law and a count in bad faith. An interpretation of the constitution, statutory and case law leads this court to conclude that once equity jurisdiction over a lawsuit is exercised, the entire matter must be decided without a jury if all counts are heard together. Thus, a plaintiff with both a contractual and an equitable claim is not entitled to a jury trial. Likewise, the defendant is not entitled to a jury trial if he files a counterclaim. Pa.R.C.P. 1510(b).

Since the bad faith statute in Pennsylvania is silent on whether a party is entitled to a jury trial the similarities between equity actions and statutory actions like this one

8

mandate that the entire matter be heard without a jury. If the jury heard testimony on both the contract and bad faith claims, the result would be extreme prejudice to the defendants.

"Trial by jury shall be as heretofore, and the right thereof remain inviolate." Constitution Article 1, Section 6. The right to have grievances heard by a jury of one's peers is a sacred notion which the Framers intended to permanently preserve in writing. However, the legislature and the courts have interpreted and applied their words narrowly. The right to a jury trial attaches where the action existed at common law when the constitution was enacted or where granted by statute. See 42 Pa.C.S. §5104(a); *Mishoe v. Erie Insurance Co.,* 762 A.2d 369, 374 (Pa. Super. 2000); *Blum v. Merrell Dow Pharmaceuticals Inc.,* 534 Pa. 97, 109, 626 A.2d 537, 543 (1993).

A party is not entitled to a jury trial in an action for bad faith against an insurer. 762 A.2d at 374. The bad faith statute is silent regarding rights to a jury trial. *Id.* at 370, 42 Pa.C.S. §8371. The next inquiry is whether the cause of action existed at the time the constitution was adopted. *Id.* at 374. In *Mishoe,* op. cit., the Superior Court stated that an action brought pursuant to 42 Pa.C.S. §8371 did not exist when the Pennsylvania Constitution was adopted, but provided a "new and independent form of action against an insured." *Id.* Thus, the parties were not entitled to a jury trial.

There is no right to a jury trial in an equity action. *Rosenberg v. Rosenberg,* 276 Pa. Super. 203, 206, 419 A.2d 167, 168 (1980), citing *Schwab v. Miller,* 302 Pa. 507, 153 A. 731 (1931). In *Rosenberg,* an ex-wife brought an action in equity against her ex-husband for failing to

comply with their written agreement. 276 Pa. Super. at 205, 419 A.2d at 168. Mr. Rosenberg then filed a counterclaim, alleging that his ex-wife had also violated the agreement. *Id.* The court decided that Mrs. Rosenberg was not entitled to a jury trial because once a matter enters the realm of equity, equity jurisdiction subsumes the entire case. *Id.* According to the court, "The principle that equity has jurisdiction to do complete justice between the parties is a long established one." *Id.* at 207, 419 A.2d at 168, citing *Wortex Mills v. Textile Workers U. of A.,* 380 Pa. 3, 109 A.2d 815 (1954).

The *Rosenberg* court also detailed the multitude of problems that could arise if the entire case was not heard by the equity court: "due process problems are inherent in a situation where a chancellor . . . hears the complaint and a jury hears the counterclaim under legal principles where the issues raised in both the case in chief and the counterclaim are the same . . . having two different tribunals rule on the same dispute, could very well result in problems of collateral estoppel . . . [i]t would also result in a burdensome, cumbersome procedure which would not be in the best interests of judicial expediency and would cause great confusion to lawyers, judges and the parties to the litigation." *Id.* at 207, 419 A.2d at 168.

It is clear that actions in equity, though they may also contain an action in law, must be governed by equitable principles for the sake of fairness and efficiency within the judicial system.

The Supreme Court in *McGovern v. Spear,* 463 Pa. 269, 344 A.2d 826 (1975), reiterated the notion that once a matter enters the realm of equity, the entire case must be decided on equitable principles. The McGoverns filed

a complaint in equity against their neighbors seeking to enjoin the Spears from maintaining a fence upon the McGoverns' property, maintaining a bright spotlight and from burning combustible materials on their own property. *Id.* at 271, 344 A.2d at 827. Since the Spears had ceased burning combustible materials seven months before the complaint was filed and the plaintiffs also sought damages, Count three was not brought in equity, but in law. *Id.* at 273, 344 A.2d at 828.

The court held that the trial court erred because it did not address the issue of damages raised in the complaint. *Id.* According to the court, "Once equity obtains jurisdiction, that jurisdiction continues until all issues raised have been determined." *Id.* at 272-73, 344 A.2d at 828. (citations omitted)

A further procedural illustration also demonstrates the practicality of the exercise of equity jurisdiction presiding in this situation. The defendant can file a counterclaim, either equitable or legal, which arises from the "same transaction or occurrence" from which the plaintiff's cause of action arose. Pa.R.C.P. 1510(a). However, such a counterclaim must be pleaded and tried as an action in equity. Pa.R.C.P. 1510(b). If the defendant did not file a counterclaim on that issue, he has no standing to object in his post-trial motions. Even if the defendant had filed a counterclaim, it would be decided on equitable principles and he would not be entitled to a jury trial anyway. Once a matter enters the realm of equity, the entire case must be decided in a court of equity.

The plaintiff clearly misjoined the two actions. The defendant had the opportunity to attack the misjoinder by filing preliminary objections. Objections not pleaded

by means of preliminary objections are waived. Pa.R.C.P. 1509(c). "Misjoinder of a cause of action" is one available form of preliminary objection applicable here. See Pa.R.C.P. 1028(a)(5). A plaintiff's request for both legal and equitable relief in the same complaint, though pled in separate counts, constitutes a misjoinder of causes of action. *City of Philadelphia v. Pennrose Management Co.,* 142 Pa. Commw. 627, 635, 598 A.2d 105, 109 (1991). Pursuant to the Rules of Civil Procedure, an action at law cannot be joined with an action in equity. *Id.* at 636, 598 A.2d at 110, citing *D'Allessandro v. Wassel,* 526 Pa. 534, 587 A.2d 724 (1991). However, since the defendant in this situation did not file preliminary objections to the improper joinder, the form of action required the court to decide the case.

Since there is no clear guidance in the statute itself whether a bad faith action can be tried with a contract action, the court finds that the applicable principles may be found in equity jurisdiction. The goal is the same—to avoid extreme prejudice to the defendants by requiring that both counts be heard by the court sitting without a jury. The defendant, having failed to file preliminary objections to the improper joinder pursuant to Pa.R.C.P. 1028(a)(5), is not entitled to a jury trial in this action.

### 2. *There Was Ample Evidence of Bad Faith and Breach of the Insurance Contract*

On the second day of trial this court engaged in the following colloquy with Michael Trump who was clearly the point person for Allstate in the resolution of the Petreccas' claim:

"The court: I have a question for you. How much effort would it have been in the letter dated December 28, 1998 to say: You failed to show us the items of damage, the damaged trap pipe, and as a result of your failure to show us this we're going to deny your claim?

"How much effort would that have been for you to specifically set forth the property that you didn't see that you needed to see?

"The witness: [Mr. Trump] *It wouldn't be a whole lot of effort.*

"The court: Then why didn't you do that?

"The witness: As far as counsel tells us we are supposed to quote the whole section of the policy because if we just quote the one section we're told it is taken out of context, so we have to quote the whole section.

"The court: So you did not on advice of counsel?

"The witness: Yes. That we are supposed to quote the entire section.

"The court: How would the insured know what somebody did wrong in the adjustment of the claim if you didn't tell them?

"The witness: Well, it was explained, apparently, to the public adjuster and they represented the insured.

"The court: Well, Charlie Kaufmann is not a registered adjuster, is he, a licensed adjuster?

"The witness: I wasn't aware of that.

"Mr. LaBar: [Counsel for defendant] I believe Mr. Kaufmann is, your honor.

"The court: Well, you believe he might be. There is no testimony that he was. So I want to know how much

trouble—you say it wouldn't have been any trouble to do that?

"The witness: No.

"The court: All right, very well. That's all I have." (N.T. 3/19/2001 pp. 72-73.) (emphasis supplied)

Section 8371 of 42 Pa.C.S. creates a statutory remedy for bad faith conduct on the part of an insurer. Bad faith has been defined as "any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means the breach of a known duty (*i.e.,* good faith and fair dealing), through some motive of self-interest or ill-will; mere negligence of bad judgment is not bad faith."

Although the facts in this case amount to a close question for this court's resolution as the foregoing colloquy demonstrates, Allstate did not engage in fair dealing with its insured. Clear communication should be a basis of any contractual relationship or any relationship in which mutuality of purpose is a foundation. The purpose of a relationship between the insurer and the insured is immediately to provide the insured with the security of knowing that it can seek a remedy for damages within the purview of its policy. In turn, the insurer requires from the insured a premium which it uses in part as the basis for a fund to provide relief for losses to its other policyholders as well as promote profits. Straightforward guidance in the claims process should be fundamental to insurance practice. The conduct of Allstate in this instance was not straightforward and thus in bad faith. The

record demonstrated that Allstate had numerous opportunities merely to inform the Petreccas that all they need do was show Mr. Trump or another authorized representative the physical remnants of their loss. Allstate never gave the Petreccas such guidance. When Allstate issued a denial letter it did not clearly state the reason for the denial. The Petreccas were left at sea.

### 3. *Testimony of Kevin Kaufmann*

The defendant complains that this court abused its discretion in permitting Kevin Kaufmann to testify to issues surrounding the adjustment of the loss to the Petreccas despite the fact that he did not personally handle the adjustment of the claim in its entirety.

Kevin Kaufmann was associated as a public adjuster with Charles Kaufmann. The plaintiff offered Kevin Kaufmann as an expert witness as to the amount of damages and the cost of repair. (N.T. 3/16/2001 p. 61.) The defendant objected to Kevin Kaufmann's testimony using the following words:

"The court: Do you have any objections?

"Mr. LaBar: Only if he is going to testify, I was going to ask if he is a plumber. I don't think he is qualified.

"The court: If that's the only objection, then his opinion as to the amount of damages and the cost of repair is admissible. I'll accept his opinion."

Mr. Kaufmann went on to testify to the damages to the Petrecca property relying on his experience in public adjustment. Upon review of the record this court finds that the defense never articulated in the words it uses in post-verdict motions its objection to the testimony of

Kevin Kaufmann, hence, that objection is waived. Even if the objection were not waived the court finds that Kevin Kaufmann exhibited sufficient familiarity with the damages the Petreccas claimed to provide him with a basis for rendering an opinion.

### 4. *Exclusion of Evidence From Michael Trump*

The defense also complains about alleged limitations this court placed upon the testimony of Michael Trump. However, the brief submitted fails specifically to cite chapter and verse of the alleged limitations. The court has located the issue in the record (see N.T. 6/19/2001 pp. 63-66) in which the following testimony and dialogue occurred:

"Question [by Mr. LaBar to Mr. Trump]: Are there specific exclusions in the policy itself?

"Answer: Yes.

"Mr. Wheeler: Objection. I object to any questions concerning policy exclusions because the basis for the denial is very clear; it was a breach of policy conditions. Nothing in there about exclusions. They haven't raised exclusions prior to the institution of suit in this case and any discussion about exclusions which may or may not apply to this case, I think, are irrelevant at this point.

"They made their bed by sending a letter, December 28, saying why they were denying this claim.

"The court: I understand the argument. But there is some validity to the argument.

"The issue here is you didn't defend this case on that. The claim wasn't turned down because there were exclusions in the policy for the loss.

16

"Mr. LaBar: We never got to that point because they didn't exhibit the damage and that's my line of questioning here. . . .

"The court: Mr. LaBar, the issue here is this, and address the argument of counsel, as emotionally and overstated as it is, that there is nothing in the letter marked as P-4 that mentions an exclusion.

"Mr. LaBar: Your honor, my argument is that they didn't show the damaged property. It doesn't get to the point of exclusion.

"The court: Well, then you have to rest on that, don't you?

"Mr. LaBar: I guess you're not going to allow me into anything else. So I guess I have to rest on it.

"The court: I guess I have to sustain the objection to this issue about an exclusion. I think you are estopped from claiming an exclusion in this record."

The foregoing exchange illustrates two facts: (1) counsel conceded that the defendant did not plead an exclusionist defense to the plaintiffs' claim, and (2) the issues in this case did not include whether or not an exclusion applied. Hence, this ground for post-verdict relief is denied.

## 5. *Does the Plaintiffs' Mistake As to the Date of Claim Justify Granting of a Nonsuit?*

As pointed out in the foregoing summary of the testimony at trial, the court permitted the plaintiffs to amend the complaint mid-trial to correct an evident mistake, viz the citation of the date of the Petreccas' loss. Comes now the defendant asserting that the variance between the date of loss in the complaint and the date of loss which all

parties used as the subject date at trial justifies the granting of a nonsuit. This argument is merely frivolous. This court refuses to hold that the defendant was somehow placed at a disadvantage throughout the pendency of these proceedings because it labored under the belief that the Petreccas' loss occurred on October 23, 1998. The defendant demonstrated no discomfort with the variance in the dates during the trial. Indeed, the defendant's counsel cross-examined knowledgeably and vigorously each time a witness addressed the Petreccas' loss. The issue in the course of this trial was not the date of the loss. The issue was the extent of the loss and whether the defendant Allstate breached its contract of insurance and committed bad faith by failing to honor the Petreccas' loss. The variance in the dates was of no consequence.

## DAMAGES

The damages this court granted the Petreccas was reasonable under the circumstances. The court finds that the defendant's objection to the damage award merely reiterates its argument on the merits and hence need not be addressed.

As to punitive damages the casual manner which Allstate adopted to deal with its insured was so far outside the bounds of the behavior expected of an insurance company that it shocked the conscience of this court justifying the award of punitive damages. *Pacific Mutual Life Insurance Co. v. Haslip,* 111 S.Ct. 1032 (1991).

## CONCLUSION

For the reasons articulated in the foregoing memorandum defendant's post-verdict motions are denied. Judg-

ment is to be entered for the plaintiffs and against the defendant.

## ORDER

And now, to wit, July 9, 2001, upon consideration of defendant Allstate Insurance Company's motion for post-trial relief, and plaintiffs' response thereto, it is hereby ordered and decreed that said motions are denied. Judgment is entered in favor of plaintiffs and against the defendant in the amount of $52,595 plus interest.